**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
James K. Rogers (No. 27287)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8540
Joseph.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
James.Rogers@azag.gov
*Attorneys for Plaintiffs Mark Brnovich and*
*the State of Arizona*

**WILENCHIK & BARTNESS PC**

Jack Wilenchik (No. 029353)
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, AZ 85004
Phone (602) 606-2816
JackW@wb-law.com

*Attorney for Plaintiff John Doe*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brnovich, in his official capacity as Attorney General of Arizona; the State of Arizona; and John Doe, <br><br> Plaintiffs, <br><br> v. <br><br> Joseph R. Biden in his official capacity as President of the United States; Alejandro Mayorkas in his official capacity as Secretary of Homeland Security; United States Department of Homeland Security; Troy Miller in his official capacity as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection; Tae Johnson in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; Ur M. Jaddou in her official capacity as Director of U.S. Citizenship and Immigration Services; United States Office of Personnel Management; Kiran Ahuja in her official capacity as director of the Office of Personnel Management and as co-chair of the Safer Federal Workforce Task Force; General Services Administration; Robin Carnahan in her | No. 2:21-cv-01568-MTL <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

official capacity as administrator of the General Services Administration and as co-chair of the Safer Federal Workforce Task Force; Office of Management and Budget; Shalanda Young in her official capacity as Acting Director of the Office of Management and Budget and as a member of the Safer Federal Workforce Task Force; Safer Federal Workforce Task Force; and Jeffrey Zients in his official capacity as co-chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator

Defendants.

1.    This case presents circumstances that would have been unthinkable to our Founding Fathers. The Executive Branch has adopted an unconstitutional policy of *favoring* aliens that have unlawfully entered the United States over actual U.S. citizens, both native and foreign born, with the inalienable right to live here. In doing so, the Biden Administration respected the putative rights of those illegally entering the United States, while simultaneously showing contempt for the actual rights of U.S. citizens. This preference is unlawful and violates the Equal Protection Clause.

2.    Defendants are trying to use federal procurement statutes to create out of thin air sweeping new power for the President to issue decrees over one-quarter of the economy. But the United States is not a dictatorship, and one man cannot simply snap his fingers and transform conduct that was previously lawful—and even protected by state law—into unlawful actions that are exceedingly dangerous to citizens' economic well-being. Instead, the President could do so—if at all—if he had statutory authority upon which he could rely and followed the procedures required by those statutes. Here, President Biden has neither such statutory authority nor has his Administration complied with the mandatory procedures of the procurement statutes putatively (but not actually) giving him authority to impose the challenged vaccination mandate here.

3.    The explicit purpose of those procurement statutes, however, is only to achieve greater economy and efficiency in the federal government's purchase of goods and services. Yet, Defendants claim that federal procurement statutes give them plenary power over the personal and private medical decisions of millions of people, thereby infringing upon (1) their constitutional rights to maintain their bodily integrity and to refuse medical treatment, and (2) their explicit statutory rights under the Emergency Use Authorization statute. Remarkably, Defendants apparently do not even appear to understand how the federal procurement statutes function, for Defendants failed to follow the basic statutory

constraint that requires that significant changes to procurement policies must be published for notice and comment before taking effect.

4.     The sweep of the contractor mandates is exceedingly broad, and reaches multiple *State* agencies, departments, and other entities, including the State's own Division of Civil Rights and its universities. And not content with subjecting only federal contractors to this unconstitutional and unlawful abuse, Defendants also seek to do the same to federal employees.

5.     At the same time, the Biden Administration has disclaimed any COVID-19 vaccination requirement for unauthorized aliens, even those being released directly into the United States. Although the Department of Homeland Security ("DHS") offers vaccination to aliens it apprehends unlawfully entering the United States, it does not insist that they be vaccinated—even if they are being released into the U.S., rather than being immediately deported. Many refuse: reporting indicates that roughly 30% decline the offer of vaccination.[1] That is so even though COVID-19 is prevalent among migrants: "more than 18% of migrant families who recently crossed the border tested positive for COVID before being released by Border Patrol. Another 20% of unaccompanied minors tested positive for the virus."[2]

6.     The upshot is that aliens unlawfully crossing into the United States are not bound by any federal vaccination requirement whatsoever. Their rights to choose to be vaccinated—*or not*—command the unadulterated respect of Defendants. Those of U.S. citizens: not so much. The same Administration that would not dream of infringing upon the right of unauthorized aliens to choose whether to be vaccinated (or not), has no equivalent regard for the rights of United States citizens.

---

[1] Michael Lee, "Biden's vaccination mandate doesn't include illegal immigrants," *Fox News* (Sept. 9, 2021), https://www.foxnews.com/politics/biden-plan-for-forced-vaccinations-doesnt-include-illegal-immigrants (accessed Sept. 10, 2021).
[2] *Id.*

3

7.      Instead, the Biden Administration has announced multiple, unprecedented federal mandates requiring U.S. citizens to be vaccinated against COVID-19, upon threat of losing their jobs or their livelihood. In particular, on September 9, 2021, President Biden pronounced that his "patience is wearing thin"[3] with Americans who choose not to receive the COVID-19 vaccine. President Biden announced plans to require that all private employers with more than 100 employees impose COVID-19 vaccine mandates on their employees; that all federal employees and contractors receive the COVID-19 vaccine; and that virtually all health care providers receive the COVD-19 vaccine.

8.      Defendants' unlawful actions here, however, are but one piece of a greater series of constitutionally improper actions: one of the greatest infringements upon individual liberties, principles of federalism, and separation of powers ever attempted by *any* administration in the history of our Republic. Defendants' ambitions are not limited to exceeding their delegated powers and violating the Constitution *merely* through unconstitutional discrimination and trampling upon due process. They also violate principles of federalism, under which the federal government has only enumerated powers, by exercising the sort of general police power reserved *solely* to the States under the Tenth Amendment and unconstitutionally subvert Congress's authority by exercising quintessentially *legislative* powers, and in a manner that could never pass either (let alone both) Houses of Congress today—which is precisely why Defendants have no intent whatsoever to ask for legislative authorization to take such unprecedented actions. Under our Constitution, the President is not a king who can exercise this sort of unbridled power unilaterally. And even George III wouldn't have dreamed that he could enact such sweeping policies by royal decree alone.

---

[3] Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (accessed Sept. 10, 2021)

9.     Defendants' vaccine mandates might have been legally defensible in a universe where there had never been a Magna Carta, a Constitution, and a Bill of Rights; or maybe in a universe where the United States only had a unitary national government with no shared sovereignty with the States. But we do not inhabit such a parallel universe. Defendants' mandates are wholly foreign to our actual system—a federal republic where powers are divided between the States and the Federal government. In our republic, the Federal government possesses only those powers specifically enumerated in the Constitution. And at all levels of government, powers are further limited by the natural rights retained by the people. However, Defendants appear to have forgotten these basic principles that are taught in the first week of high school civics class.

10.     Recognizing that the Federal Government lacks the authority to directly impose a mandate, even the President's own Chief of Staff retweeted that what the administration was planning for citizens (but not unauthorized aliens) would be the "ultimate work-around."



Source: https://www.foxnews.com/politics/klain-vaccine-coronvirus-mandate

11.     At the same time, driven by President Biden's campaign promises of lax immigration enforcement and loose border security, Defendants have created a crisis at the southern border leading to an unprecedented wave of unlawful immigration into the U.S. And even though about one in five aliens arriving in the United States without authorization are infected with COVID-19, Defendants let these aliens refuse vaccination, thus protecting aliens' freedom and bodily autonomy more than for American citizens.[4]

12.     Furthermore, federal immigration law requires that all arriving aliens, even those claiming asylum, be detained pending a decision as to whether they have a valid basis to enter the United States. *See* 8 U.S.C. § 1225(b)(2)(A); id. § 1225(b)(1)(B). This requirement applies "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. *Id*. § 1225(a)(1)

13.     As the Supreme Court recently explained, there is only one "circumstance[]" under which" these arriving aliens "may be released" from detention: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

14.     The Biden Administration is ignoring these requirements. It has released at least 225,000 illegal border crossers since taking office,[5] including "[a]bout 50,000" whom the government released without initiating immigration court proceedings as required by law.[6] This practice was apparently authorized by "[g]uidance sent to border patrol ... from

---

[4] *Supra*, n. 1.

[5] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[6] https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

6

agency leadership," which has not been made public, and which appears to claim broad "prosecutorial discretion" to ignore the requirements of the immigration laws.[7]

15. Defendants' favorable treatment of unauthorized aliens appears to be having an effect. As Table 1 (taken from Defendants' own website) shows, DHS encounters with unauthorized aliens are at their highest level in years, and continually increasing.

**Table 1: CPB Encounters With Unauthorized Aliens By Month**



**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY: (All)  Component: (All)  Demographic: (All)
Citizenship Grouping: (All)  Title of Authority: (All)  **Reset Filters**

FY   2018   2019   2020   2021 (FYTD)

FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 71,946 | 72,113 | 73,995 | 78,414 | 101,099 | 173,281 | 178,799 | 180,563 | 189,020 | 213,534 | 208,887 | | 1,541,651 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |
| 2018 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |

[7] https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html

Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

16.     Recent reporting has confirmed DHS's own statistics: "U.S. authorities detained more than 1.7 million migrants along the Mexico border during the 2021 fiscal year that ended in September, and arrests by the Border Patrol soared to the highest levels ever recorded, according to unpublished U.S. Customs and Border Protection data obtained by The Washington Post."[8]

17.     While the Biden Administration has offered an array of shifting excuses, those have continually been disproved, for example: "Illegal crossings began rising last year but skyrocketed in the months after President Biden took office. As CBP arrests increased this past spring, Biden described the rise as consistent with historic seasonal norms. But the busiest months came during the sweltering heat of July and August, when more than 200,000 migrants were taken into custody."[9]

18.     The violation of the Equal Protection Clause is evident and egregious. In a nutshell: unauthorized aliens will not be subject to *any* vaccination requirements even when released directly into the United States (where most will remain), while roughly a *hundred million* U.S. citizens will be subject to unprecedented vaccination requirements. This reflects an unmistakable—and unconstitutional—brand of favoritism in favor of unauthorized aliens.

19.     This discrimination in favor of unauthorized aliens violates the Equal Protection Clause. Notably, alienage is a suspect class that triggers strict scrutiny. More typically (and almost invariably previously), this discrimination was *against* aliens rather than for them. *See*, *e.g.*, *Graham v. Richardson*, 403 U.S. 365, 371, 375-376 (1971); *Application of Griffiths*, 413 U.S. 717, 721 (1973). But the same principle applies to

---

[8] https://www.washingtonpost.com/national/border-arrests-record-levels-2021/2021/10/19/289dce64-3115-11ec-a880-a9d8c009a0b1_story.html
[9] *Id.*

8

favoritism *against* U.S. citizens in favor of aliens. Defendants' actions could never conceivably pass strict scrutiny.

20.     The violation of the Equal Protection Clause is evident at the applicable decision-making level here. All of the decisions regarding the vaccination mandates and non-mandates have been made by the President himself and the Executive Office of the President ("EOP"), with individual agencies then given commands to implement the mandates/non-mandates. And the President/EOP have (1) expressly decided to impose a variety of vaccination mandates that will fall overwhelmingly or exclusively upon U.S. citizens, lawful permanent residents, and aliens otherwise lawfully present in the United States and (2) simultaneously decided to *decline* to impose any vaccination mandates upon migrants unlawfully entering the United States even when in U.S. custody. The EOP has been explicit about its refusal to impose mandates on unauthorized aliens and instead giving them a true choice about whether to accept the U.S. government's offer of vaccination. For example, during a September 10, 2021 press conference, White House Press Secretary Jen Psaki had the following exchange with a reporter:

> Q    Okay.  And then why is it that you're trying to require anybody with a job or anybody who goes to school to get the COVID-19 vaccine, but you're not requiring that of migrants that continue walking across the southern border into the country?
>
> MS. PSAKI:  Well, look, our objective is to get as many people vaccinated across the country as humanly possible.  And so the President's announcement yesterday was an effort to empower businesses, to give businesses the tools to protect their workforces.  That's exactly what we did.
>
> But certainly we want everybody to get vaccinated.  And more people who are vaccinated, whether they are migrants or whether they are workers, protects more people in the United States.
>
> Q    But it's a requirement for people at a business with more than 100 people, but it's not a requirement for migrants at the southern border.  Why?

MS. PSAKI: That's correct.[10]

At a press briefing on September 20, the issue came up again. Psaki announced that the government "in early November, we'll be putting in place strict protocols to prevent the spread of COVID-19 from passengers flying internationally into the United States by requiring that adult foreign nationals traveling to the United States be fully vaccinated."[11] When Psaki was questioned about the different policy for unauthorized aliens crossing the border illegally, Psaki said "[a]s individuals come across the border and — they are both assessed for whether they have any symptoms. If they have symptoms, they are — the intention is for them to be quarantined; that is our process. They're not intending to stay here for a lengthy period of time. I don't think it's the same thing."[12] Psaki never explained how her justification was coherent or logical, given that most international air travelers are temporary visitors who are also "not intending to stay here for a lengthy period of time."

21.     U.S. citizens, lawful permanent residents, lawfully present migrants, and unauthorized aliens are all similarly situated for purposes of the relevant decisions here. Coronavirus is an equal opportunity infector that is completely indifferent to the nationality/citizenship status of any human being. It will happily infect them all. Unauthorized aliens do not spread coronavirus any better or worse than those lawfully present in the United States. But the Biden Administration has unlawfully exempted authorized aliens from all of its vaccination mandates, while imposing an array of

---

[10] Jen Psaki, White House Press Briefing (Sept. 10, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/10/press-briefing-by-press-secretary-jen-psaki-september-10-2021/ (accessed Oct. 20, 2021)

[11] Jen Psaki, White House Press Briefing (Sept. 20, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/20/press-briefing-by-press-secretary-jen-psaki-september-20-2021/ (accessed Oct. 20, 2021); *see also* Brittany Bernstein, "saki on Why Migrants Can Enter U.S. But Unvaccinated Foreign Nationals Can't: 'Not the Same Thing,'" *National Review*, Sept. 20, 2021, https://www.yahoo.com/now/psaki-why-migrants-enter-u-204052876.html (accessed Oct. 20, 2021).

[12] *Id.*

unprecedented, overlapping, and extensive mandates that fall almost exclusively upon U.S. citizens and lawful permanent residents. This preference for unauthorized aliens violates the Equal Protection Clause.

22. Moreover, even if only rational basis review applied, Defendants' discrimination is still unconstitutional. Given that, on information and belief, hundreds of thousands of aliens apprehended by Defendants are being released into the United States, and given Defendants' palpable indifference to whether these aliens are vaccinated, Defendants' simultaneous and unhealthy fixation as to whether U.S. citizens are vaccinated is irrational and indefensible. Defendants' policy of *absolutely excluding* unauthorized aliens from *all vaccination requirements*, while subjecting U.S. citizens to *multiple, unprecedented, sweeping*, *and intrusive* mandates is wildly unconstitutional and should not stand.

23. Because Defendants' respect for individual rights vis-à-vis vaccination mandates appears to extend *only* to unauthorized aliens, and not U.S. citizens, their actions violate the Equal Protection Clause and should be invalidated. American citizens should be entitled to treatment at least as favorable as what Defendants afford to unauthorized aliens. This Court should accordingly declare this preferential treatment unlawful and enjoin actions taken pursuant to it.

24. The illegality and incoherence of Defendants' policies is also apparent in their differential treatment among immigrants. Those who illegally enter the United States will not be subject to *any* vaccination mandate. In stark contrast, aliens who go through legal channels to obtain work visas, lawfully enter the United States, and are employed by a company with more than 99 workers, *will* be subject to the vaccination mandate. Defendants' policies thus discriminate between immigrants by unconstitutionally favoring those who *illegally* entered the United States over those who lawfully did so.

## PARTIES

25.     Plaintiff Mark Brnovich is the Attorney General of the State of Arizona. He is the State's chief legal officer and has the authority to represent the State in federal court. Plaintiff State of Arizona is a sovereign state of the United States of America.

26.     Plaintiff Arizona is one of four states on the United States-Mexico border. As a border state, it suffers disproportionately from immigration-related burdens. Upon information and belief, multiple agencies and political subdivisions of the State are contractors with the federal government and thus subject to Defendants' COVID-19 vaccine mandate. Included among those contractors is the Civil Rights Division of the Arizona Attorney General's Office.

27.     Plaintiff has been an employee of the Federal government for 30 years. He works at a federal worksite located within the State of Arizona. He has an exemplary personnel record, and no record of prior discipline, with "Outstanding" performance evaluations the past two years (which is the highest possible) and nothing in recent memory below "excellent" (which is the next highest evaluation). He strongly opposes the COVID-19 vaccine, and he has not taken it. He also opposes Defendants' vaccine mandate and has no intention of complying with it. Plaintiff Doe has requested a medical exemption from Defendants' federal employee vaccine mandate. Given the limited and strict approach Defendants have applied to exemption requests, and reports that nearly all such requests are being denied, Plaintiff Doe expects that his medical exemption request will be denied.

28.     Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

29.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security. Secretary Mayorkas is sued in his official capacity.

30.     Defendant United States Deparment of Homeland Security is a federal agency.

31. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection ("CBP"). Acting Commissioner Miller is sued in his official capacity.

32. Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Acting Director Johnson is sued in his official capacity.

33. Defendant Ur M. Jaddou serves as Director of U.S. Citizenship and Immigration Services. Director Jaddou is sued in her official capacity.

34. Defendant United States Office of Personnel Management ("OPM") is an independent federal agency.

35. Defendant Kiran Ahuja is director of OPM and co-chair of the Safer Federal Workforce Task Force.

36. Defendant General Services Administration ("GSA") is an independent federal agency.

37. Defendant Robin Carnahan is administrator of GSA and co-chair of the Safer Federal Workforce Task Force.

38. Defendant Office of Management and Budget ("OMB") is an office within the Executive Office of the President of the United States

39. Defendant Shalanda Young is Acting Director of the Office of Management and Budget and is a member of the Safer Federal Workforce Task Force;

40. Defendant Safer Federal Workforce Task Force was established on January 20, 2021 by Executive Order 13991.

41. Defendant Jeffrey Zients is co-chair of the Safer Federal Workforce Task Force and is the Biden Administration's COVID-19 Response Coordinator.

**JURISDICTION AND VENUE**

42.     This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1346, and 1361.

43.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201-2202.

44.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiffs reside in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

**LEGAL BACKGROUND**

**Equal Protection**

45.     The Supreme Court established in *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954) that the Equal Protection Clause of the Fourteenth Amendment is incorporated against the federal government through the Fifth Amendment's Due Process Clause. *See also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017) (the Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment").

46.     Aliens and citizens are protected classes in equal protection jurisprudence, triggering strict scrutiny when the government has a differential policy based on such classifications. *See Graham v. Richardson*, 403 U.S. 365, 371, 375-376 (1971); *Application of Griffiths*, 413 U.S. 717, 721 (1973). Generally, prior case law in this area has involved discrimination *against* aliens as a class. But the reverse preference in *favor* of authorized aliens is just as constitutionally suspect.

**Federalism And The Tenth Amendment**

47.     Under principles of federalism, the federal government has only enumerated powers and not the sort of general police power reserved *solely* to the States under the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 919 (1997) ("Residual state

14

sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'"). "The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." The Federalist No. 45 (James Madison). Thus, the "police power" is "inherent in the states" and is "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935). It is well-settled that the power to impose vaccine mandates, if any such power exists, is part of the police powers reserved to the States. *E.g. Zucht v. King*, 260 U.S. 174, 176 (1922) ("it is within the police power of a *state* to provide for compulsory vaccination" (emphasis added)).

**The Procurement Act**

48.     The purpose of the Federal Property and Administrative Services Act (the "Procurement Act") "is to provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101. The Procurement Act allows the President to "prescribe policies and directives that the President considers necessary to carry out" the Act, but requires that such policies "be consistent with" the Act. 40 U.S.C. § 121(a). Such policies (and regulations established pursuant to them) are not valid unless there is "a nexus between the regulations and some delegation of the requisite legislative authority by Congress," and "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979).

49.     There is no such nexus when such policies are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). There is also no such nexus when such policies are imposed on subcontractors, who have "no direct connection to federal procurement" and thus do "not lie 'reasonably within the contemplation of'" the Procurement Act. *Id*. at 171–72. Furthermore, the Procurement Act does not confer on the President the power to impose policies that "conflict with another federal statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996).

**The Procurement Policy Act**

50.     The Office of Federal Procurement Policy Act ("Procurement Policy Act") requires that "a procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register ... if it—(A) relates to the expenditure of appropriated funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a). This requirement may only be "waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. § 1707(d).

**The Emergency Use Authorization Statute**

51.     Under 21 U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction ... of a drug, device, or biological product intended for use in an actual or potential emergency" before such products receive full FDA approval. Such Emergency Use Authorizations ("EUAs") are subject to strict requirements, including that "individuals to whom the product is administered are informed ... of the **option to accept or refuse administration of the product**." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III)

16

(emphasis added). The FDA has interpreted this provision of the EUA statute to mean that "[r]ecipients **must have an opportunity to accept or refuse the EUA product** and must be informed of any consequences of refusing administration of the product" and that this right to refuse can only be waived if the President makes a specific determination in writing, and only with respect to members of the armed forces.[13] When Congress adopted the statute, it interpreted it in the same way, explaining it as "the *right* ... to refuse administration of a product."[14]

**The Major Questions Doctrine**

52.    Courts will not assume that Congress has assigned to Executive Branch questions of "deep economic and political significance" unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

53.    Defendants' attempts to use the Procurement Act as justification for the contractor mandate is akin to the Federal Government's recent attempt at using the Public Health Safety Act as justification for a far-reaching nationwide eviction moratorium. That attempt was swiftly struck down by the Supreme Court, which held that "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast

---

[13] FDA, *Guidance Emergency Use Authorization of Medical Products*, 2007 WL 2319112, at *15 and n.16 (acknowledging that "Congress authorized the President to waive, under certain circumstances, the option for members of the armed forces to accept or refuse administration of an EUA product") (emphasis added); *see also*, FDA, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders*, OMB Control No. 0910-0595 at 24 n.46 (Jan. 2017), https://www.fda.gov/media/97321/download; 10 U.S.C. § 1107a(a) (stating that the requirements of 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III), as applied to the armed forces, "may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security"); *Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability*, 70 Fed. Reg. 5452-02, 5455 (Feb. 2, 2005) (creating EUA for anthrax vaccine for members of the armed forces, and stating that "[i]ndividuals who refuse anthrax vaccination will not be punished").

[14] H.R. Conf. Rep. No. 108-354, at 782 (2003) (emphasis added).

economic and political significance.'" *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). This is particularly so when the federal government "intrudes into an area that is the particular domain of state law." *Id.* The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* The Procurement Act contains no such language conferring on the President the authority to impose nationwide public health measures.

**Due Process Rights To Bodily Integrity And To Refuse Medical Treatment**

54.    "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). This right is rooted in "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997). The "rights to determine one's own medical treatment[] and to refuse unwanted medical treatment" are fundamental rights," and individuals have "a fundamental liberty interest in medical autonomy." *Coons v. Lew*, 762 F.3d 891, 899 (9th Cir. 2014) (as amended) (cleaned up).

55.    "[D]ue process ... substantively protects a person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citations omitted). Individuals thus have a "constitutional right to be free from state-imposed violations of bodily integrity." *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). A "forcible injection ... into a nonconsenting person's body represents a substantial interference with that person's

liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). The right to "bodily integrity" is "fundamental" and is "deeply rooted in this Nation's history and tradition." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). "Every violation of a person's bodily integrity is an invasion of his or her liberty. The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death. Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment." *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part).

56.      Under the unconstitutional conditions doctrine, the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them...."); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("[A]n overarching principle, known as the unconstitutional conditions doctrine, . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."). The same rule applies to government contracts. *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 678 (1996).

**Vaccine Mandates Are Illegal Under Arizona Law**

57.      Arizona law makes it illegal for state and local governments to impose vaccine mandates and restricts the power of private employers to impose them, including the following statutory provisions[15]:

---

[15] The status of these statutes under Arizona constitutional requirements is currently being challenged in State court and the Attorney General is vigorously defending them. *See Arizona School Boards Ass'n Inc. v. State*, No. CV2021012741, 2021 WL 4487632 (Ariz

- Public universities and community colleges in the State "may not require that a student obtain a COVID-19 vaccination or show proof of receiving a COVID-19 vaccination or place any conditions on attendance or participation in classes or academic activities, including mandatory testing or face covering usage, if the person chooses not to obtain a COVID-19 vaccination or disclose whether the person has been vaccinated against COVID-19, unless the vaccination or other mandate is required by the laws of this state." A.R.S. § 15-1650.05(A).

- "Notwithstanding any other law, this state and any city, town or county of this state are prohibited from establishing a COVID-19 vaccine passport or requiring ... [a]ny person to be vaccinated for COVID-19." A.R.S. § 36-681(A)(1).

- "A school district or charter school may not require a student or teacher to receive a vaccine for COVID-19 or to wear a face covering to participate in in-person instruction." A.R.S. § 15-342.05(B).

- "An immunization for which a United States food and drug administration emergency use authorization has been issued" cannot be required for in-person school attendance. A.R.S. § 36-672(C)(2).

- "If an employer receives notice from an employee that the employee's sincerely held religious beliefs, practices or observances prevent the employee from taking the COVID-19 vaccination, the employer shall provide a reasonable accommodation unless the accommodation would pose an undue hardship and more than a de minimus cost to the operation of the employer's business." A.R.S. § 23-206.

---

.Super. Sep. 27, 2021). Although a single superior court judge has held these provisions were invalidly enacted, the Arizona Supreme Court has granted review of that decision (skipping over the Arizona Court of Appeals in doing so). The Attorney General has the duty to prosecute and defend in the Arizona Supreme Court "all proceedings in which the state or an officer of this state in the officer's official capacity is a party." A.R.S. § 41-193(A)(1). Briefing in that case is complete, and oral argument is set for November 2, 2021.

**The Immigration And Nationality Act**

58. "[T]he Immigration and Nationality Act ("INA") ... establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985). When aliens arrive in the United States, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," unless they indicate an intention to apply for asylum. 8 U.S.C. § 1225(b)(1)(A)(i). In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution. § 1225(b)(1)(B)(ii). If the alien makes that showing, he "shall be detained for further consideration of the application for asylum." *Id.* (emphasis added),

59. Aliens not subject to Section 1225(b)(1) are governed by Section 1225(b)(2), which requires that, unless an alien is "clearly and beyond a doubt entitled to be admitted," the alien "*shall* be detained" pending further immigration proceedings. § 1225(b)(2); *see Jennings*, 138 S. Ct. at 837. Because Congress has mandated detention under both subsection (b)(1) and subsection (b)(2), arriving aliens—other than those who are clearly and beyond a doubt entitled to be admitted—are to be released only pursuant to the government's parole authority, which is described in 8 U.S.C. § 1182(d)(5)(A).

60. This parole authority may be used only "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Other than parole, there are "no other circumstances under which aliens detained under § 1225(b) may be released." *Jennings*, 138 S. Ct. at 844; *see also* 8 C.F.R. § 208.30(f)(2) (explaining that Section 1182(d)(5) is the only basis for releasing an alien to which Section 1225(b)(1) applies); 8 C.F.R. § 212.5 (describing some of DHS's parole practices).

61.     Notably, the government's parole authority previously was much broader, and could then be used "for emergent reasons or for reasons deemed strictly in the public interest." Congress, however, subtantially narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

62.     Mandatory detention aside, the government is also required to initiate removal proceedings against these aliens. The government does so by serving the alien with a charging document, which is the document that initiates proceedings in immigration court. For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[16]

63.     For aliens falling under Section 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed ... without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed ... without further hearing or review." *Id.* at § 1225(b)(1)(B)(iii)(I). And even for aliens who pass a credible fear screening, they still must be served with a charging document. USCIS admits this.[17]

---

[16] *See* https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal%20-%20English%20%2817%29.pdf, at 1–2 (discussing other similar charging documents).

[17] *See* https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28Approved%20as%20final%2011-7-11%29.pdf, at 2 (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. See https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf, at 5.

The same is true of aliens falling under Section 1225(b)(2). These aliens must be "detained for a proceeding under Section 1229a," 8 U.S.C. § 1225(b)(2)(A), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

## FACTUAL BACKGROUND

**The Vaccine Development And Approval Process**

64. According to the CDC, usually "[v]accine licensing is a lengthy process that can take 10 years or longer" that involves "three phases of clinical trials with human subjects before they can be licensed for use in the general public."[18] A Phase 3 trial is the final phase before a vaccine is approved and involves a much larger test group than the first two phases. "Typically, these [phase 3] trials last several years" to allow researchers time to compare vaccine recipients "to those who have not received the vaccine" and thus discover potential side effects of the vaccine.[19]

65. Vaccines that have not yet been fully approved by the FDA may be approved under an Emergency Use Authorization that is less rigorous than the full approval process. For example, the FDA typically only requires two months' worth of data from Phase 3 trials to approve an EUA.[20]

66. The FDA's process for full approval of COVID-19 vaccines has been significantly accelerated. For example, the Phase 3 trial data that the FDA used to grant "approval of the [Pfizer] COMIRNATY [vaccine] included participants 16 years of age and older who had been enrolled from July 27, 2020, and who were followed for ... follow-

---

[18] CDC, *Vaccine Safety: Overview, History, and How the Safety Process Works*, https://www.cdc.gov/vaccinesafety/ensuringsafety/history/index.html, (accessed Oct. 18, 2021).

[19] *Id.*

[20] FDA, *Emergency Use Authorization for Vaccines Explained*, https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (accessed Oct. 18, 2021).

up through as late as March 13, 2021."[21] The FDA thus required less than eight months of Phase 3 trial data, rather than the period of several years normally used to observe side effects and adverse events.

**Biden Administration Response to COVID-19**

67.     On January 20, 2021 President Biden signed an Executive Order ("EO") 13991 (86 Fed. Reg. 7045), which established the Safer Federal Workforce Task Force ("SFWTF") and tasked it with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed. Reg. at 7046. The SFWTF is headed by three co-chairs: (1) the Director of OPM; (2) the Administrator of GSA; and (3) the COVID–19 Response Coordinator. The Director of OPM is also a member of the SFWTF. The EO also required that GSA "provide funding and administrative support for the" SFWTF. *Id*.

68.     On September 9, 2021, President Biden announced his "new plan to *require* more Americans to be vaccinated" by imposing "new vaccination *requirements*" that "*require* all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week." He also announced plans to "*require[e]* vaccinations" of "those who work in hospitals, home healthcare facilities, or other medical facilities — a total of 17 million healthcare workers." He further announced that he would "sign an executive order that will now *require* all executive branch federal employees to be vaccinated — all. And I've signed another executive order that will *require* federal contractors to do the same." And finally, he announced that he would "*require* all of nearly 300,000 educators in the federal paid program, Head Start program" to get vaccinated.[22]

---

[21] FDA, Vaccines and Related Biological Products Advisory Committee September 17, 2021 Meeting Briefing Document, https://www.fda.gov/media/152176/download, (accessed Oct. 18, 2021).
[22] *Supra* n. 3 (emphasis added).

69.    President Biden listed as one of the main justifications for his new COVID mandates that "the FDA granted ... approval" for the COVID—19 vaccine and "[s]o, the time for waiting is over."[23]

70.    In reality, however, only the Pfizer Comirnaty vaccine—just one of the three COVID-19 vaccines subject to President Biden's COVID-19 vaccine mandate—has been approved by the FDA. The other two available COVID-19 vaccines (manufactured by Moderna and by Johnson & Johnson) are not FDA-approved and are only available under EUAs.

71.    Additionally, upon information and belief, the Comirnaty vaccine is not currently being distributed in the United States. For example, an NIH notice from September 13, 2021 states that "[a]t present, Pfizer does not plan to produce any [Comirnaty] product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution."[24] The only Pfizer COVID-19 vaccine actually available in the United States is the prior Pfizer–BioNTech COVID-19 version that is also only available pursuant to an EUA. Therefore, the only three COVID-19 vaccines available in the United States to satisfy President Biden's vaccine demands are vaccines available only under EUAs, and which are therefore subject to the requirements of 21 U.S.C. § 360bbb-3.

72.    Following President Biden's remarks, the White House released a webpage with further information about Defendants' "COVID Plan." The White House stated that "[t]he Department of Labor's Occupational Safety and Health Administration (OSHA) ... will issue an Emergency Temporary Standard (ETS) to implement" the requirement that "all employers with 100 or more employees to ensure their workforce is fully vaccinated

---

[23] *Id*.

[24] National Institutes of Health, "Pfizer received FDA BLA license for its COVID-19 vaccine," *DailyMed, U.S. National Library of Medicine*, (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (accessed Oct. 20, 2021)

or require any workers who remain unvaccinated to produce a negative test result on at least a weekly basis." The White House webpage also stated that the Centers for Medicare & Medicaid Services (CMS) would "require COVID-19 vaccinations for workers in most health care settings that receive Medicare or Medicaid reimbursement..., apply[ing] to approximately 50,000 providers and cover[ing] a majority of health care workers across the country."[25]

73. Even though natural immunity from prior COVID-19 infection is better than, or at least no worse than, immunity conferred by the vaccine,[26] Defendants have failed to provide for any exemptions for persons who have already been infected with COVID-19.

74. Before September 2021, Defendants' consistent position had been that the federal government *lacks* the authority Defendants are now claiming to possess. For example, at a July 23, 2021 press briefing, Psaki acknowledged that imposing vaccine mandates is "not the role of the federal government; that is the role that institutions, private-sector entities, and others may take.... What our role is and what we are going to continue to do is make the vaccine available. We're going to continue to work in partnership to fight misinformation. And we're going to continue to advocate and work in

---

[25] https://www.whitehouse.gov/covidplan/ (accessed Sept. 10, 2021)

[26] *E.g.*, Sivan Gazit, et al., "Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections," *medRxiv*, Aug. 25, 2021, https://doi.org/10.1101/2021.08.24.21262415 ("This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity."); Kristen W. Cohen, et al., "Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells," *Cell Reports Medicine*, July 14, 2021, https://doi.org/10.1016/j.xcrm.2021.100354 ("Here, we evaluate 254 COVID-19 patients longitudinally up to 8 months and find durable broad-based immune responses.").

partnership with local officials and — and trusted voices to get the word out."[27] Similarly, on December 4, 2020, in response to a question about whether COVID-19 vaccines should be made mandatory, then-President-Elect Biden said "[n]o, I don't think it should be mandatory. I wouldn't demand it to be mandatory."[28]

**The Contractor Mandate**

75.    On September 9, 2021, President Biden signed an EO imposing on federal contractors "COVID [s]afety [p]rotocols" to be established and issued by the SFWTF by September 24, 2021.[29] The EO did not explicitly make any provision for religious or medical exemptions to the "safety protocols."

76.    On September 24, 2021 the SFWTF released on its website guidance to federal agencies for implementing Defendants' vaccine mandate on contractors and subcontractors (the "Contractor Mandate").[30] This guidance was never published to the Federal Register for public comment. Attached as Exhibit 1 is a copy of that guidance. Among other things, the guidance included the following:

- A deadline of December 8, 2021 for "covered contractor employees" to be fully vaccinated.

- A deadline of November 24, 2021 for employees of contractors or subcontractors to receive their final vaccination (or only vaccination, in the case of the Johnson &

---

[27] Jen Psaki, White House Press Briefing (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/ (accessed Sept. 28, 2021)

[28] Jacob Jarvis, "Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?," *Newsweek* (Sept. 10, 2021), https://www.msn.com/en-us/news/politics/fact-check-did-joe-biden-reject-idea-of-mandatory-vaccines-in-december-2020/ar-AAOiq5S.

[29] Exec. Order No. 14042, 86 Fed. Reg. 50985, "Ensuring Adequate COVID Safety Protocols for Federal Contractors," (Sept. 9, 2021).

[30] SFWTF, "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," (Sept 24, 2021), https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20210922.pdf (accessed Oct. 21, 2021).

Johnson vaccine), because the guidance defines "fully vaccinated" to mean two weeks after receiving the requisite number of doses of an approved COVID-19 vaccine. The guidance defines "fully vaccinated" to include vaccines approved only by EUA.

- A definition of the term "covered contractor employee" to "include[] employees of covered contractors who are not themselves working on or in connection with a covered contract" if they are working at the same location, thus imposing vaccine requirements on employees of contractors and subcontractors who are not even working on federal contracts.

- A requirement that the Federal Acquisition Regulatory Council ("FAR Council") conduct rulemaking to amend the Federal Acquisition Regulation ("FAR") to impose the Contractor Mandate.

- A deadline of October 8, 2021 for the FAR Council to develop a contract clause to implement the Contractor Mandate for agencies to include in contracts. The guidance also instructs the FAR Council to "recommend that agencies exercise their authority to deviate from the FAR" and use the vaccination mandate clause in contracts even before the FAR is amended.

- A deadline of October 15, 2021 for agencies to include that contractual clause in solicitations

- A deadline of November 14, 2021 after which awarded contracts must include that contractual clause. For contracts entered into between October 15 and November 14 and for which the solicitation was issued before October 15, the guidance states that agencies are encouraged to include the clause, but are not required to do so.

- A requirement that, for contracts awarded "prior to October 15 and where performance is ongoing", the vaccine mandate clause "must be incorporated at the point at which an option is exercised or an extension is made."

- Requirements that the Contractor Mandate must apply even to: 1) persons who have already been infected with COVID-19; 2) workplace locations that are outdoors; and 3) contractor employees who are working remotely full time.

- A statement assserting that the guidance supersedes legal requirements in States or localities that prohibit vaccine mandates.

77.     On September 28, 2021, Shalanda Young, the Acting Director of the Office of Management and Budget published a notice in the Federal Register[31] in which Ms. Young made the conclusory contention that "compliance with COVID–19-related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." She further stated that she had "determined that compliance by Federal contractors and subcontractors with the COVID–19-workplace safety protocols detailed in [the SFWTF] guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."

78.     Ms. Young did not cite to any information or evidence that would support the claims in her determination, nor did she explain how she reached her conclusion. Furthermore, Ms. Young's notice was not subject to public commenting. Notably, however, Ms. Young's determination did not claim there were any urgent and compelling circumstances in this case, and her Federal Register notice did not include a 41 U.S.C. § 1707(d) waiver of the Procurement Policy Act requirement that a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register. Nor did Ms. Young's notice invoke the good cause exception (5 U.S.C. § 553(b)(3)(B)) to the APA's notice-and-comment requirements.

---

[31] 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021).

79.     Federal authorities have already communicated with some Arizona State agencies, including public universities, claiming that the agency is subject to the contractor mandate and must impose vaccine mandates on their employees. This creates a significant conflict, as mandates are illegal under State law. *See* ¶ 57.

**The Federal Employee Mandate**

80.     On September 9, 2021 President Biden also signed an EO requiring that "[e]ach agency shall implement ... a program to *require* COVID-19 vaccination for all of its Federal employees" (the "Employee Mandate").[32] The EO required the SFWTF to issue guidance for agencies by September 16, 2021, and made no explicit provision for any religious or medical exemptions to the vaccination requirement.

81.     On September 16, 2021 the SFWTF updated the "Frequently Asked Questions" ("FAQ") section of its website,[33] ostensibly in an attempt to fulfill the EO's guidance requirement. Among other things, the updated FAQ included the following:

- A deadline of November 22, 2021 for federal employees to be "fully vaccinated" and also after which new federal employees would need to be fully vaccinated before starting work.

- A deadline of November 8, 2021 for employees to receive their final vaccination (or only vaccination, in the case of the Johnson & Johnson vaccine), because the FAQ defines "fully vaccinated" to mean "2 weeks after [employees] have received the requisite number of doses of a[n approved] COVID-19 vaccine." The FAQ defines "fully vaccinated" as including vaccines approved only by EUA.

- Imposition of the Employee Mandate 1) for federal employees who are working remotely full-time and thus do not pose any risk of exposing other federal employees

[32] Exec. Order No. 14043, 86 Fed. Reg. 50989, "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," (Sept. 9, 2021) (emphasis added).
[33] https://www.saferfederalworkforce.gov/faq/vaccinations/

to COVID-19 and 2) for federal employees who have already been infected with COVID-19 and thus already have natural immunity.

- A warning to agencies to allow exemptions from the Employee Mandate only "in *limited circumstances* where the law requires an exception." (emphasis added).

82.     Attached as Exhibit 2 is a copy of the updated FAQ. On information and believe, the SFWTF has never issued official, formal guidance to agencies; has never published its guidance in the Federal Register; and has not followed any notice-and-comment procedures before issuing its guidance.

**The Mandates Will Have Deep Economic And Political Significance**

83.     Upon information and belief, the vaccination mandates will cause a significant proportion of unvaccinated federal and contractor employees to resign to avoid the mandates. The Society for Human Resource Management conducted a survey of businesses subject to Defendants' Mandates and found that "85 percent said the anticipated requirement will make retaining employees more difficult. Eighty-nine percent said some of their employees will quit due to the new mandate."[34] Similarly, a leading trade publication covering the construction industry has predicted that more than 40% of employees in the construction industry, "when faced with the choice between the vaccine and their job with a federal contractor, will quit and go to work for another contractor that does not have such a mandate"[35] In a tight labor market, these resignations will greatly hurt productivity of the federal workforce and thus impair economy and efficiency.

---

[34] Allen Smith, "Survey: Vaccine-or-Testing Mandate Will Be Difficult to Implement," Society for Human Resource Management, (Oct. 15, 2021), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/coronavirus-survey-vaccine-testing-mandate-challenges.aspx
[35] Engineering News-Record, "How Will President Biden's Vaccine Workplace Mandate impact you and your company?." (Sept. 23, 2021), https://www.enr.com/articles/52467-temperature-check-president-bidens-vaccine-workplace-mandate (accessed Sept. 24, 2021).

84.     This employee resistance and sensitivity of the issues presented here was further evidenced by the recent experience of Southwest Airlines Company. Southwest Airlines had to cancel over 2000 flights in the past ten days as pilots refused to work in the wake of the company's vaccine mandate and the pilot's union's suit to stop it.[36] "The key driver for such cancellations is likely the COVID-19 vaccine mandate for its employees. Southwest employees are expressing their concern in droves by simultaneously and strategically using their sick time benefits."[37] What's more, estimates indicate that such massive impact can be felt by the action of "just over 2 percent of their employees being unavailable. This illustrates how vulnerable the airline is to organized worker shortages even among a small group of potentially disgruntled employees."[38] And the company would not have put a vaccine requirement in place but for the Biden administration's mandate, as Southwest's CEO Gary Kelly has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been."[39] In addition to being consumer airlines, "Southwest Airlines and American Airlines are among the carriers that are federal contractors and subject to" the government contractor mandate, so their employees may not utilize "regular Covid testing as an alternative to a vaccination" as other large, non-contractor business employees may.[40]  And while the

---

[36] Sheldon H. Jacobson, *Southwest Airlines debacle is symptomatic of bigger pandemic problems*, The Hill, Oct. 18, 2021, https://thehill.com/opinion/healthcare/577248-southwest-airlines-debacle-is-symptomatic-of-bigger-pandemic-problems?rl=1.

[37] *Id*.

[38] *Id.*

[39] Emily Crane, *Southwest CEO says he's against vaccine mandates, blames Biden*, New York Post, Oct. 12, 2021, https://nypost.com/2021/10/12/southwest-ceo-gary-kelly-blames-biden-for-vaccine-mandate

[40] Leslie Josephs, *Southwest drops plan to put unvaccinated staff on unpaid leave starting in December*, CNBC, Oct. 19, 2021, https://www.cnbc.com/2021/10/19/southwest-vaccine-mandate-unpaid-leave-exemptions.html

airline claims weather and air traffic control issues as its official justification for the unprecedented disruption in service, it is telling that in response, it has dropped one of its major enforcement mechanisms for the mandate: forced unpaid leave.[41]

85.     On average, federal government spending accounts for 20% to 25% of the U.S. economy, and has been even higher during the COVID-19 pandemic. Furthermore, by Defendants' own estimates, the contractor and subcontractor mandates will affect "millions" of individuals.[42] Defendants' vaccine mandates thus have deep economic and political significance.

**Defendants Have Created A Crisis At The Border**

86.     Defendants have dismantled much of the country's border enforcement infrastructure, for example, 1) by imposing a near-moratorium on alien removals through a memorandum issued on January 20, 2021, through interim guidance issued by DHS on February 18, 2021, and then through similar permanent guidance issued on September 30, 2021; 2) by abandoning the Migrant Protection Protocols (MPP) requiring that aliens from third countries requesting asylum at the border with Mexico must wait in Mexico while awaiting adjudication of their asylum application[43]; and 3) by abandoning construction of already-planned and funded border wall and fencing. Defendants' actions have led to an enormous increase in attempted border crossings by eliminating disincentives to being caught.

---

[41] *Id.*

[42] https://www.whitehouse.gov/covidplan/ (characterizing EO 14042 as a plan "[r]equiring [v]accinations for ... [m]illions of [c]ontractors")

[43] Defendants' attempt to abandon MPP was enjoined by a district court, and both the Fifth Circuit and U.S. Supreme Court have denied the federal government's requests for a stay pending appeal. *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (Aug. 24, 2021); *State v. Biden*, No. 21-10806, 2021 WL 3674780, at *1 (5th Cir. Aug. 19, 2021).

87.     DHS's own statistics reveal the unprecedented surge of unlawful migration and the collapse of DHS's control of the border. July 2021 had the highest number of encounters in *decades*—"the highest monthly encounter number since Fiscal Year 2000."[44] DHS data show that the number of border encounters in July 2021 was more than five times the July 2020 and July 2018 numbers, and roughly 2.5 times July 2019.[45] DHS itself has admitted that it is "encountering record numbers of noncitizens ... at the border" that "have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity."[46]

88.     Reporting by the Washington Post on October 20 reveals internal DHS data showing that apprehensions at the southwest border "soared to the highest levels ever recorded."[47]

89.     Secretary of Homeland Security Alejandro Mayorkas acknowledged in August 2021 that the Department of Homeland Security has lost control of the border, lamenting that the current situation is "unsustainable," that it "cannot continue," that the system is getting close to "breaking," and that "we're going to lose."[48]

**Defendants Treat Unauthorized Aliens More Favorably Than Citizens**

90.     Notwithstanding the border crisis, on September 10, 2021, White House Press Secretary Jen Psaki confirmed that COVID-19 vaccinations are not required for unauthorized aliens at the border. Psaki never explained, however, why Defendants would

---

[44] Declaration of David Shahoulian (DHS Assistant Secretary for Border and Immigration Policy) at 1-2, *Huisha-Huisha v. Gaynor*, No. 21-cv-100 (D.D.C. Aug. 2, 2021)

[45] https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

[46] *Supra*, n. 44.

[47] https://www.washingtonpost.com/national/border-arrests-record-levels-2021/2021/10/19/289dce64-3115-11ec-a880-a9d8c009a0b1_story.html

[48] Edmund DeMarche, Emma Colton, and Bill Melugin, "Mayorkas says border crisis 'unsustainable' and 'we're going to lose' in leaked audio," *Fox News* (Aug. 13, 2021), https://www.foxnews.com/politics/mayorkas-leaked-audio-border.

require such vaccinations of American citizens and aliens authorized to work in the United States, but at the same time give aliens the right to choose whether to be vaccinated.[49] At a press briefing ten days later, when Psaki was again asked to explain this inconsistency, her justification for not imposing a vaccine mandate on unauthorized aliens illegally crossing the border was that "[t]hey're not intending to stay here for a lengthy period of time."[50] Psaki failed to explain what she meant by "lengthy period of time," especially given the fact that 80% of aliens who are allowed to enter the country to apply for asylum do not show up for their asylum hearings. *See* ¶ 93.

**Defendants' Violations Of The INA Relating To Parole**

91.     Defendants are systematically violating the detention and removal requirements of Section 1225. Moreover, they are also ignoring the INA's limitations on the authority to parole aliens into the United States. For the entire month of December 2020—President Trump's last full month in office—the Border Patrol released into the interior only 17 aliens after arresting them crossing the Southwest border and serving them with a notice to appear.[51] By July 2021, that number had risen to over 60,000, and the total number of unlawful aliens that Border Patrol has released at the border since President Biden took office is over 225,000.[52]

---

[49] Andrew Mark Miller, "Psaki stands by having employer vaccine mandate while illegal immigrants get a pass," *Fox News* (September 10, 2021), https://www.foxnews.com/politics/psaki-stands-by-employer-vaccine-mandate-while-illegal-immigrants-remain-unvaccinated-thats-correct (accessed September 10, 2021).

[50] Jen Psaki, White House Press Briefing (Sept. 20, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/20/press-briefing-by-press-secretary-jen-psaki-september-20-2021/ (accessed Oct. 20, 2021)

[51] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[52] The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other

92.     Releasing this many arriving aliens into the interior necessarily means that the government is violating Congress's commands in the INA. If immigration officials are simply releasing these aliens, they are violating the mandatory detention provisions in Section 1225. If they are, instead, paroling each of these individuals, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

93.     It is also unclear whether the numbers reported by CBP include the approximately "50,000 migrants who crossed the southern border illegally" and were released without even being served with a notice to appear.[53] For these unlawful aliens, and likely many more, the government has instead served them with a "notice to report," a document nowhere mentioned in statute or regulation, which apparently functions as "immigration enforcement by the honor system."[54] Predictably, although the notice to report asks these aliens to turn themselves into an ICE office within 60 days, approximately 80% fail to do so.[55]

94.     Border Patrol documents that were leaked to the press in October 2021 show that Defendants have released "[a]t least 160,000 illegal immigrants ... into the U.S. [since March 2021], often with little to no supervision." The documents also show that Defendants have made "broad use of limited parole authorities to make more than 30,000 eligible for work permits since August [2021]" and that since August 6, 2021, "the

---

DHS components, the total is probably even larger.

[53] https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html

[54] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system

[55] *Id.*

administration has released an additional 40,000 illegal immigrants on their own recognizance."[56]

95.    Beyond Defendants' failed honor-system policy, serving a notice to report has other significant consequences. Most importantly, once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed *in absentia*." *Texas v. Biden*, __ F. Supp. 3d __, 2021 WL 3603341, at *4 (N.D. Tex. 2021). After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who declines to report following issuance of a notice to report—again, because this document has no legal significance and is nowhere to be found in statute or regulation.

96.    And, as further explained below, even aliens who are served with charging documents frequently do not appear for their removal proceedings. The Biden Administration is thus giving tens-of-thousands of aliens per month, in essence, license to disappear into the interior of the United States.

97.    DHS's illegal use of its parole to promote open-border policies is consistent with multiple other violations of immigration mandates by the Biden Administration, as courts have repeatedly held. *See*, *e.g.*, *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 2096669, at *38 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, --- F. Supp. 3d ---

---

[56] Bill Melugin and Adam Shaw, "Leaked Border Patrol docs show mass release of illegal immigrants into US by Biden administration," *Fox News*, August 13, 2021 (https://www.foxnews.com/politics/leaked-border-patrol-docs-release-immigrants-us-biden-administration).

, 2021 WL 3683913, at *42 (S.D. Tex. 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).[57]

98.     The Administration has even been found to have violated Section 1225(b)'s detention requirements, the same requirements Arizona claims the government is violating here. *See Texas v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) (denying a stay because "the Government has not come close to showing that it is likely to succeed in challenging" the conclusion that it violated 8 U.S.C. § 1225).[58]

99.     In those cases, the Biden Administration insisted it lacked the resources to comply with its duties. *See, e.g.*, Mot. for Stay at 4, *Texas*, 2021 WL 3683913 (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

100.     Meanwhile, the Biden Administration is going out of its way to make its bad-faith protests about limited resources closer to reality. For example, the Administration has asked Congress to reduce the number of immigration detention beds available to it.[59] It has justified this request in part based on "recent decreases in interior enforcement activity."[60]

101.     Similarly, the Administration has eliminated programs designed to reduce the taxing of immigration resources and detention space. For example, on its first day in

---

[57] A panel of the Fifth Circuit stayed that preliminary injunction in part, but declined to stay the injunction insofar as it required the federal government not to release aliens subject to those two statutes. *See Texas v. United States*, --- F.4th ---, 2021 WL 4188102, at *3 (5th Cir. 2021).

[58] The Supreme Court also denied the government a stay. *See Biden v. Texas*, --- S. Ct. --- , 2021 WL 3732667 (Aug. 24, 2021)

[59] https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-4d7427ff67d586a77487b7efec58e74d; Congressional Research Service, *DHS Budget Request Analysis: FY2022*, at 13 (noting that DHS's FY 2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY 2021 (reducing that average to 30,000)).

[60] https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_en forcement.pdf, at 43

office, the Biden Administration suspended the Migrant Protection Protocols. *Biden*, 2021 WL 3603341 at *7. This DHS program "returned some aliens temporarily to Mexico during the pendency of their removal proceedings." Id. at *1. As CBP's statistics show, the Migrant Protection Protocols were effective at eliminating the illegal release of arriving aliens at the border because aliens remained in Mexico pending adjudication of their asylum claims rather than occupying DHS detention capacity.[61] *See also Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of the program, in which DHS found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border"). Unlike the Biden Administration's release policies, this program is expressly authorized by the immigration laws, which provide that "[i]n the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a [removal] proceeding." 8 U.S.C. § 1225(b)(2)(C).

102.    And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. See, e.g., Exec. Order No. 14,010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, 86 Fed. Reg. 8267, 8270 (Feb. 2, 2021) (revoking, among others, Executive Order 13767, which directed DHS to "terminat[e] ... the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

---

[61] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab); https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (same)

103.    Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[62] The Biden Administration has, of course, not sought to do so.

**The Vaccine Mandates Harm The State Of Arizona**

104.    Defendants' actions directly injure the State's quasi-sovereign "interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population," as well as its "interest in securing residents from the harmful effects of discrimination." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ("Snapp")*, 458 U.S. 592, 607-09 (1982). Defendants' policies directly injure these interests, by subjecting Arizona residents to unlawful discrimination and denying them of the benefit of the Equal Protection and Due Process Clauses.

105.    Furthermore, because State agencies and political subdivisions qualify as "government contractors," *see* ¶ 79, the Contractor Mandate will harm the State of Arizona in three ways. First, by requiring the State to violate the Constitution and Federal and State law, *see* ¶¶ 45-57 and 114-145, or face the loss of federal funds and contracts. Second, by causing State employees subject to the mandate to resign. In the current tight labor market, this will cause significant harm to the State's operations through the loss of institutional knowledge and human capital. It will also cause the State to incur significant recruitment, on-boarding, and training costs to replace lost employees. Third, because vaccine mandates and public health more generally, are part of the police power reserved to the States under the Tenth Amendment, the vaccine mandates harm the State's sovereign interests and concern in defending its statutes and seeing that they are faithfully executed.

106.    The combination of these effects injures the State's sovereign, quasi-sovereign, and proprietary interests.

---

[62] *Immigration Detenting: Opportunities Exist to Improve Cost Estimates*, United States Government Accountability Office (April 2018), https://www.gao.gov/assets/gao-18-343.pdf.

**The Vaccine Mandate Harms Plaintiff John Doe**

107.    Because Plaintiff John Doe is not eligible for a religious exemption and because his medical exemption will almost certainly be denied, he will either be subject to dismissal from his employment, or will suffer serious violations of his constitutional rights to bodily integrity and to refuse medical treatment. Furthermore, the vaccine mandate will infringe his right under the EUA statute to refuse the vaccines.

**The Border Crisis Harms The State of Arizona**

108.    States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id*. at 410. Arizona thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

109.    As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration. Arizona is required to expend its scarce resources when DHS fails to carry out its statutory duty to detain or remove aliens as provided by law. This includes resources expended by Arizona's law enforcement community.

110.    Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal Assistance Program ("SCAAP") requests, the great majority of which are not reimbursed by the federal government.

111.    Defendants' actions encourage a greater influx of unauthorized aliens into Arizona, further increasing law enforcement costs in Arizona, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

112.     Federal law also requires that emergency medical services be provided to unlawfully present aliens. 42 C.F.R. § 440.255(c). Arizona emergency medical providers deliver millions of dollars in medical services to unlawfully present aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves. While these costs are impactful in typical years, the COVID-19 pandemic makes the potential for harm to Arizona through additional emergency healthcare costs to unauthorized aliens exceptionally high. Defendants' failure to detain or remove aliens, and Defendants' unlawful use of parole to allow hundreds of thousands of aliens to enter the United States, necessarily increases the number of unlawfully present aliens in Arizona who are subject to receiving such medical care at the expense of Arizona's healthcare institutions.

113.     Defendants' failures to remove or detain aliens, and Defendants' unlawful use of parole to allow hundreds of thousands of aliens to enter the United States, will increase Arizona's costs of providing emergency medical care to these individuals who would otherwise be removed or detained. Additionally, Defendants' actions encourage a greater influx of unauthorized aliens into Arizona, further increasing the population of unauthorized aliens for whom Arizona must bear the cost of emergency medical care.

## CLAIMS FOR RELIEF

## COUNT I

**Unconstitutional Preference for Unauthorized Aliens Over U.S. Citizens Regarding COVID-19 Vaccine Requirements**

**(Asserted Under the Equal Protection Clause of the Fourteenth Amendment, As Incorporated Against the Federal Government Under the Fifth Amendment)**

114.     The allegations in the preceding paragraphs are reincorporated herein.

115.     The Equal Protection Clause of the Fourteenth Amendment, which is incorporated against the Federal Government Under the Due Process Clause of the Fifth Amendment, guarantees equal protection of the laws and forbids the government from

treating persons differently than similarly situated individuals on the basis of race, religion, national origin, or alienage. *Sessions*, 137 S. Ct. at 1686 n.1 (2017); *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954).

116. Defendants' imposition of vaccine mandates on U.S. citizens and lawfully employed aliens, but not on unauthorized aliens at the border or already present in the United States, constitutes discrimination on the basis of national origin and alienage in violation of the Equal Protection Clause.

117. Defendants' failure to articulate any justification for their differential, favorable treatment of unauthorized aliens demonstrates discriminatory intent.

118. Defendants' overt statements and expressive acts, including those of President Biden stating his "patience is wearing thin" with Americans who choose not to receive the COVID-19 vaccine and his Chief of Staff retweeting that the plan was the "ultimate work-around" further indicate discriminatory intent.

119. All of the relevant decisions regarding vaccination mandates have been made by the President himself and the EOP. Those decision-makers have explicitly decided (1) not to impose any vaccination mandates on unauthorized aliens themselves but simultaneously to (2) impose a slew of vaccination mandates through various federal agencies that will fall almost exclusively on U.S. citizens, lawful permanent residents, and other aliens lawfully present in the United States. Defendants' refusal to impose any corresponding mandates on unauthorized aliens is intentional and admitted.

120. For purposes of disease management and vaccination policy, U.S. citizens, lawful permanent residents, and aliens both lawfully and unlawfully present in the United States are all similarly situated. Coronavirus does not distinguish between humans in deciding who to infect and immigration status has no effect on how people infected with Covid-19 spread the virus. To coronavirus, we are all simply hosts to infect. But the Biden Administration has nonetheless decided to engage in unconstitutional discrimination based

on immigration status without any public health basis for the distinctions. In doing so, it has engaged in the "sordid business … [of] divvying us up by" immigration status. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part).

121.    The Biden Administration has done so purely for political purposes, because vaccination mandates on U.S. citizens and legal residents is popular with its political base, but corresponding mandates on migrants unlawfully present in the United States are not. The Equal Protection Clause precludes such discrimination for nakedly political ends.

122.    There is no rational basis for Defendants' differential, favorable treatment of unauthorized aliens. For relevant purposes, unauthorized aliens and U.S. citizens/lawful permanent residents are similarly situated.

123.    Defendants' differential treatment between immigrants lawfully present in the United States and unauthorized aliens—with vaccination mandates only to apply to the former—is similarly unconstitutional and irrational.

## COUNT II

### Violation of the Procurement Act

### (Asserted Under 40 U.S.C. §§ 101 and 121)

124.    The allegations in the preceding paragraphs are reincorporated herein.

125.    There is no nexus between Defendant's vaccine mandates and the Procurement Act's purpose of providing an "economical and efficient system" of procurement, 40 U.S.C. § 101 and in fact will have a deleterious effect on economy and efficiency by causing large-scale resignations of unvaccinated employees of federal contractors.

126.    Defendants' attempt to impose sweeping controls on one-fourth of the economy via procurement is a question of deep economic and political significance, and Congress did not intend, nor does the Procurement Act allow, the President to exercise

44

such sweeping authority under the guise of "procurement" in the absence of clear and explicit congressional authorization. Such arrogation of power violates the Major Questions Doctrine.

127. Defendants' mandate on sub-contractors has no direct connection to federal procurement and thus does not lie reasonably within the contemplation of' the Procurement Act.

128. Defendants' vaccine mandates for contractors and subcontractors are therefore unlawful under the Procurement Act.

## COUNT III

### Violation of Procurement Policy Act

### (Asserted Under 41 U.S.C. § 1707(a))

129. The allegations in the preceding paragraphs are reincorporated herein.

130. Defendants' SFWTF contractor/subcontractor guidance, including the vaccine mandate contained therein, is a procurement "policy" and also a procurement "procedure" under 41 U.S.C. § 1707(a).

131. Defendants' SFWTF contractor/subcontractor guidance, including the vaccine mandate contained therein, relates to the expenditure of appropriated funds; has a significant effect beyond internal operating procedures; and imposes a significant cost and administrative impact on contractors and offerors.

132. Defendants failed to publish for public comment in the Federal Register their SFWTF contractor/subcontractor guidance, including its vaccine mandate, as required by 41 U.S.C. § 1707. Nor did Defendants provide the required 60-day comment period before it became effective. *Id*.

133. No authorized officer ever waived the requirements of the Procurement Policy Act as applied to the SFWTF contractor/subcontractor guidance, or to the vaccine mandate contained therein.

134. Defendants failed to comply with the requirements of the Procurement Policy Act when issuing the SFWTF contractor/subcontractor guidance, including its vaccine mandate. The SFWTF contractor/subcontractor guidance, including its vaccine mandate, is therefore unlawful.

## COUNT IV

### Violation of the EUA Statute

### (Asserted Under 21 U.S.C. § 360bbb-3)

135. The allegations in the preceding paragraphs are reincorporated herein.

136. The vaccines available to federal contractors and employees to satisfy Defendants' vaccine mandates are only available under EUAs and are thus subject to the requirements of 21 U.S.C. § 360bbb-3.

137. Under 21 U.S.C. § 360bbb-3, recipients of vaccines available under EUAs must have the right "to accept or refuse administration of the" vaccines.

138. Defendants' vaccine mandates would strip from all federal employees, contractors, and subcontractors their right to refuse the EUA vaccines.

139. Defendants' vaccine mandates for federal employees and contractors are therefore unlawful under 21 U.S.C. § 360bbb-3.

## COUNT V

### Violation of Right to Due Process, Bodily Integrity, and to Refuse Medical Treatment

### (Asserted Under Fifth Amendment to the U.S. Constitution)

140. The allegations in the preceding paragraphs are reincorporated herein.

141. Defendants' vaccine mandates violate the constitutional rights of federal employees and contractors to bodily integrity and to refuse medical treatment.

142. Defendants' vaccine mandates are therefore a violation of the Fifth Amendment of the Constitution and are therefore unlawful.

**COUNT VI**

**Federalism**

**(Asserted Under Tenth Amendment to the U.S. Constitution)**

143. The allegations in the preceding paragraphs are reincorporated herein.

144. The power to impose vaccine requirements, to the extent that any such power exists, is a police power reserved to the States.

145. Defendants' vaccine mandate on private employers is a violation of the Tenth Amendment of the Constitution and of principles of federalism enshrined in the Constitution. It is therefore unlawful.

**COUNT VII**

**Agency Action Not in Accordance with Law and in Excess of Authority**

**(Defendants' Parole Policies)**

**(Asserted Under 5 U.S.C. § 706)**

146. The allegations in the preceding paragraphs are reincorporated herein.

147. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority, or limitations, or short of statutory right." See 5 U.S.C. § 706(2)(A), (C).

148. Defendants' policy—whether codified in writing or not[63]—of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2). And if Defendants claim to be exercising their parole authority, their policy is contrary to 8 U.S.C. § 1182 because that authority is neither being used "on a case-by-case basis" nor limited to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

---

[63] An unwritten policy is subject to APA challenge just as a written policy is. *See Brotherhood of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities).

149.    Nor does any regulation authorize Defendants' policy. 8 C.F.R. § 212.5—the principal parole regulation—says nothing about the mass release of arriving aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of Sections 1225(b) and 1182(d)(5)(A).

150.    Moreover, for the reasons described in ¶¶ 62-63, Defendants are required at a minimum to issue charging documents to arriving aliens released into the interior and initiate removal proceedings, which the Biden Administration has failed to do at least 50,000 times since taking office.

151.    Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT VIII

### Arbitrary and Capricious Agency Action in Violation of the APA

### (Defendants' Parole Policies)

### (Asserted Under 5 U.S.C. § 706)

152.    The allegations in the preceding paragraphs are reincorporated herein.

153.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

154.    Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

155.    Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

156.    Moreover, Defendants have neither accounted for Arizona's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Regents*, 140 S. Ct. at 1913.

157.    Finally, insofar as Defendants claim their policy is justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## COUNT IX

**Failure to Comply with Notice-and-Comment Requirements in Violation of the APA**

**(Defendants' Parole Policies)**

**(Asserted Under 5 U.S.C. § 706)**

158.    The allegations in the preceding paragraphs are reincorporated herein.

159.    The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

160.    Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[64]

---

[64] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the

## COUNT X

### Agency Action Unlawfully Withheld or Unreasonably Delayed in Violation of the APA

### (Defendants' Parole Policies)

### (Asserted Under 5 U.S.C. § 706)

161. The allegations in the preceding paragraphs are reincorporated herein.

162. At a minimum, Defendants' near-blanket refusal to comply with the mandatory-detention provisions in Section 1225 and the limits on their parole authority in Section 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT XI

### Violation of the INA and the Constitution

### (Defendants' Parole Policies)

### (Asserted Under The INA And The Constitution)

163. The allegations in the preceding paragraphs are reincorporated herein.

164. The APA aside, the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count VII. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment:

A. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, Defendants' differential

   COVID-19 vaccination policies regarding (1) unauthorized aliens and (2) U.S.

---

merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). But the reason the en banc court did not address the notice-and-comment argument is because the federal government conducted notice and comment in response to the panel opinion. *Id*. at 984.

citizens/lawful permanent residents, including by declaring that Defendants do not have authority to impose the vaccination mandate on U.S. citizens and lawful permanent residents, let alone discriminate against them as compared to unauthorized aliens;

B. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, Defendants' COVID-19 vaccine mandates on federal contractors because they violate the Tenth Amendment of the Constitution and principles of federalism;

C. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, Defendants' COVID-19 vaccine mandates on federal employees and contractors because the mandates violate Due Process under the Fifth Amendment of the Constitution;

D. Declaring, pursuant to 28 U.S.C. § 2201, that the SFWTF guidance for contractors, including the Contractor Mandate and Defendants' other COVID-19 requirements for federal contractors and sub-contractors, are unlawful under 41 U.S.C. § 1707(a) and 40 U.S.C. §§ 101 and 121;

E. Declaring, pursuant to 28 U.S.C. § 2201, that Defendants' requirements that federal employees, contractors, and sub-contractors must accept administration of EUA vaccines is unlawful under 21 U.S.C. § 360bbb-3);

F. Declaring unlawful the Biden Administration's policy of releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States, and declaring that these policies were issued without observance of procedure required by law;

G. Enjoining Defendants from engaging in unconstitutional discrimination against U.S. citizens, lawful permanent residents, and lawfully present aliens, and specifically enjoining Defendants from imposing on U.S. citizens, lawful permanent residents, and

lawfully present aliens any COVID-19 vaccination policies different from those imposed on unauthorized aliens already present in the United States and on aliens illegally entering the United States;

H. Enjoining Defendants from imposing COVID-19 vaccination requirements on federal contractors, sub-contractors, and employees;

I. Enjoining Defendants from issuing any COVID-19 requirements on federal contractors or sub-contractors without first following the required notice-and-comment procedures of the Procurement Policy Act;

J. Enjoining Defendants from releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States;

K. Awarding Plaintiffs costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

L. Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 22nd of October, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By: */s/ James K. Rogers*
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    James K. Rogers (No. 27287)

*Attorneys for Plaintiffs Mark Brnovich and the State of Arizona*

**WILENCHIK & BARTNESS PC**

By: */s/ Jack Wilenchik (with permission)*
    Jack Wilenchik (No. 029353)

*Attorney for Plaintiff John Doe*