**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
James K. Rogers (No. 27287)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8540
Joseph.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
James.Rogers@azag.gov
*Attorneys for Plaintiffs Mark Brnovich and*
*the State of Arizona*

**WILENCHIK & BARTNESS PC**

Jack Wilenchik (No. 029353)
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, AZ 85004
Phone (602) 606-2816
JackW@wb-law.com

*Attorney for Plaintiff John Doe*

**NAPIER, BAILLIE, WILSON, BACON**
**& TALLONE, P.C.**

Michael Napier (No. 002603)
Eric R. Wilson (No. 030053)
Cassidy L. Bacon (No. 031361)
2525 E. Arizona Biltmore Cir, Ste C-135
Phoenix, Arizona 85016
Phone: 602.248.9107
mike@napierlawfirm.com

*Attorneys for Plaintiff PLEA and United*
*Phoenix Firefighters Association Local*
*493*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brnovich, in his official capacity as Attorney General of Arizona; the State of Arizona; John Doe; Phoenix Law Enforcement Association ("PLEA"); and United Phoenix Firefighters Association Local 493,<br><br>Plaintiffs,<br>v.<br><br>Joseph R. Biden in his official capacity as President of the United States; Alejandro Mayorkas in his official capacity as Secretary of Homeland Security; United States Department of Homeland Security; Troy Miller in his official capacity as Senior Official Performing the Duties of the Commissioner of U.S. Customs and | No. 2:21-cv-01568-MTL<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Border Protection; Tae Johnson in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; Ur M. Jaddou in her official capacity as Director of U.S. Citizenship and Immigration Services; United States Office of Personnel Management; Safer Federal Workforce Task Force ("SFWTF"); Kiran Ahuja in her official capacity as director of the Office of Personnel Management and as co-chair of the SFWTF; General Services Administration; Robin Carnahan in her official capacity as administrator of the General Services Administration and as co-chair of the SFWTF; Office of Management and Budget; Shalanda Young in her official capacity as Acting Director of the Office of Management and Budget and as a member of the SFWTF; and Jeffrey Zients in his official capacity as co-chair of the SFWTF and COVID-19 Response Coordinator; L. Eric Patterson in his official capacity as Director of the Federal Protective Service and member of the SFWTF; James M. Murray in his official capacity as Director of the United States Secret Service and member of the SFWTF; Deanne Criswell in her official capacity as Director of the Federal Emergency Management Agency and member of the SFWTF; Rochelle Walensky in her official capacity as Director of the Centers for Disease Control and Prevention and member of the SFWTF; Defendant Centers for Disease Control and Prevention; the Federal Acquisition Regulatory Council; Mathew C. Blum, in his official capacity as Chair of the Federal Acquisition Regulatory Council and Acting Administrator of the Office of Federal

Procurement Policy, Office of Management and Budget; Lesley A. Field, in her official capacity as a member of the Federal Acquisition Regulatory Council and Acting Administrator for Federal Procurement at the Office of Federal Procurement Policy, Office of Management and Budget; Karla S. Jackson, in her official capacity as a member of the Federal Acquisition Regulatory Council and Assistant Administrator for Procurement at the National Aeronautics and Space Administration; Jeffrey A. Koses, in his official capacity as a member of the Federal Acquisition Regulatory Council and Senior Procurement Executive at the General Services Administration; John M. Tenaglia in his official capacity as a member of the Federal Acquisition Regulatory Council and Principal Director of Defense Pricing and Contracting at the Department of Defense; the United States of America; and the City of Phoenix

Defendants.

**INTRODUCTION**

1.      This case presents circumstances that would have been unthinkable to our Founding Fathers. Defendants seek to impose vaccine mandates that are patently unfair, clearly devoid of common sense, and manifestly unlawful. They are also dangerously un-American.

2.      Defendants are trying to use federal procurement statutes to create out of thin air sweeping new power for the President to issue decrees over one-quarter of the economy. But the United States is not a dictatorship, and one man cannot simply snap his fingers and transform conduct that was previously lawful—and even protected by state law—into unlawful actions that are exceedingly dangerous to citizens' economic well-being. Instead, the President could do so—if at all—if he had statutory authority upon which he could rely and followed the procedures required by those statutes. Here, President Biden has neither such statutory authority nor has his Administration complied with the mandatory procedures of the procurement statutes putatively (but not actually) giving him authority to impose the challenged vaccination mandate here.

3.      The explicit purpose of those procurement statutes, however, is only to achieve greater economy and efficiency in the federal government's purchase of goods and services. Yet, Defendants claim that federal procurement statutes give them plenary power over the personal and private medical decisions of millions of people, thereby infringing upon (1) their constitutional rights to maintain their bodily integrity and to refuse medical treatment, and (2) their explicit statutory rights under the Emergency Use Authorization statute. Remarkably, Defendants apparently do not even appear to understand how the federal procurement statutes function, for Defendants failed to follow the basic statutory constraint that requires that significant changes to procurement policies must be published for notice and comment before taking effect.

4. The sweep of the contractor mandates is exceedingly broad, and reaches multiple *State* agencies, departments, and other entities, including the State's own Division of Civil Rights and its universities. And not content with subjecting only federal contractors to this unconstitutional and unlawful abuse, Defendants also seek to do the same to federal employees. And because Defendants have already amended the guidance for Contractor and Employee mandates multiple times, there is no telling what other onerous obligations may put Plaintiffs in breach at a moment's notice.

5. The Biden Administration has announced multiple, unprecedented federal mandates requiring persons to be vaccinated against COVID-19, upon threat of losing their jobs or their livelihood. In particular, on September 9, 2021, President Biden pronounced that his "patience is wearing thin"[1] with Americans who choose not to receive the COVID-19 vaccine. President Biden announced plans to require that all private employers with more than 100 employees impose COVID-19 vaccine mandates on their employees; that all federal employees and contractors receive the COVID-19 vaccine; and that virtually all health care providers receive the COVD-19 vaccine.

6. Defendants' unlawful actions here, however, are but one piece of a greater series of constitutionally improper actions: one of the greatest infringements upon individual liberties, principles of federalism, and separation of powers ever attempted by *any* administration in the history of our Republic. Defendants' ambitions are not limited to exceeding their delegated powers and violating the Constitution *merely* through trampling upon due process. They also violate principles of federalism, under which the federal government has only enumerated powers, by exercising the sort of general police power reserved *solely* to the States under the Tenth Amendment and unconstitutionally subvert Congress's authority by exercising quintessentially *legislative* powers, and in a

---

[1] Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (accessed Sept. 10, 2021)

4

manner that could never pass either (let alone both) Houses of Congress today—which is precisely why Defendants have no intent whatsoever to ask for legislative authorization to take such unprecedented actions. Under our Constitution, the President is not a king who can exercise this sort of unbridled power unilaterally. And even George III wouldn't have dreamed that he could enact such sweeping policies by royal decree alone.

7.    Defendants' vaccine mandates might have been legally defensible in a universe where there had never been a Magna Carta, a Constitution, and a Bill of Rights; or maybe in a universe where the United States only had a unitary national government with no shared sovereignty with the States. But we do not inhabit such a parallel universe. Defendants' mandates are wholly foreign to our actual system—a federal republic where powers are divided between the States and the Federal government. In our republic, the Federal government possesses only those powers specifically enumerated in the Constitution. And at all levels of government, powers are further limited by the natural rights retained by the people. However, Defendants appear to have forgotten these basic principles that are taught in the first week of high school civics class.

8.    Recognizing that the Federal Government lacks the authority to directly impose a mandate, even the President's own Chief of Staff retweeted that what the administration was planning would be the "ultimate work-around."



Source: https://www.foxnews.com/politics/klain-vaccine-coronvirus-mandate

**PARTIES**

9.     Plaintiff Mark Brnovich is the Attorney General of the State of Arizona. He is the State's chief legal officer and has the authority to represent the State in federal court.

10.     Plaintiff State of Arizona is a sovereign state of the United States of America. Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

11.     Plaintiff Arizona is one of four states on the United States-Mexico border. As a border state, it suffers disproportionately from immigration-related burdens. Upon information and belief, multiple agencies and political subdivisions of the State are contractors with the federal government and thus subject to Defendants' COVID-19 vaccine mandate. Included among those contractors is the Civil Rights Division of the Arizona Attorney General's Office.

12.     Plaintiff John Doe has been an employee of the Federal government for 30 years. He works at a federal worksite located within the State of Arizona. He has an

exemplary personnel record, and no record of prior discipline, with "Outstanding" performance evaluations the past two years (which is the highest possible) and nothing in recent memory below "excellent" (which is the next highest evaluation). He strongly opposes the COVID-19 vaccine, and he has not taken it. He also opposes Defendants' vaccine mandate and has no intention of complying with it. Plaintiff Doe has requested a medical exemption from Defendants' federal employee vaccine mandate. Given the limited and strict approach Defendants have applied to exemption requests, and reports that nearly all such requests are being denied, Plaintiff Doe expects that his medical exemption request will be denied.

13. Plaintiff Phoenix Law Enforcement Association ("PLEA") is the certified representative pursuant to the City of Phoenix meet and confer ordinance for unit 4 rank and file police officers and brings this action on behalf of itself and on behalf of the officers it represents.

14. Plaintiff United Phoenix Firefighters Association Local 493 is the certified bargaining representative for the firefighters for the City of Phoenix and brings this action on behalf of itself and on behalf of the firefighters it represents.

15. Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

16. Defendant Alejandro Mayorkas is the Secretary of Homeland Security. Secretary Mayorkas is sued in his official capacity.

17. Defendant United States Deparment of Homeland Security is a federal agency.

18. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection ("CBP"). Acting Commissioner Miller is sued in his official capacity.

19.     Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Acting Director Johnson is sued in his official capacity.

20.     Defendant Ur M. Jaddou serves as Director of U.S. Citizenship and Immigration Services. Director Jaddou is sued in her official capacity.

21.     Defendant United States Office of Personnel Management ("OPM") is an independent federal agency.

22.     Defendant Kiran Ahuja is director of OPM and co-chair of the Safer Federal Workforce Task Force. Director Ahuja is sued in her official capacity.

23.     Defendant General Services Administration ("GSA") is an independent federal agency.

24.     Defendant Robin Carnahan is administrator of GSA and co-chair of the Safer Federal Workforce Task Force. She is sued in her official capacity.

25.     Defendant Office of Management and Budget ("OMB") is an office within the Executive Office of the President of the United States.

26.     Defendant Shalanda Young is Acting Director of the Office of Management and Budget and is a member of the Safer Federal Workforce Task Force. She is sued in her official capacity.

27.     Defendant Safer Federal Workforce Task Force was established on January 20, 2021 by Executive Order 13991. The three co-chairs who oversee the SFWTF are: (1) the Director of OPM; (2) the Administrator of GSA; and (3) the COVID-19 Response Coordinator. The other named members of the SFWTF are (1) Director of the Federal Protective Service; (2) the Director of the United States Secret Service; (3) the Administrator of the Federal Emergency Management Agency; and (4) the Director of the CDC.

28.     Defendant Jeffrey Zients is co-chair of the Safer Federal Workforce Task Force and is the Biden Administration's COVID-19 Response Coordinator. He is sued in his official capacity.

29.     Defendant L. Eric Patterson is Director of the Federal Protective Service and is a member of the SFWTF. He is sued in his official capacity.

30.     Defendant James M. Murray is Director of the United States Secret Service and is a member of the SFWTF. He is sued in his official capacity.

31.     Defendant Deanne Criswell is Director of the Federal Emergency Management Agency and is a member of the SFWTF. She is sued in her official capacity.

32.     Defendant Rochelle Walensky is Director of the Centers for Disease Control and Prevention and is a member of the SFWTF and is also the head of the agency which stands to exclude Arizona from some federal contracts on the basis of this vaccine mandate. She is sued in her official capacity.

33.     Defendant Centers for Disease Control and Prevention (the "CDC") is a federal agency.

34.     Defendant Federal Acquisition Regulatory Council ("FAR Council") is the agency exclusively charged with creating "[g]overnment-wide procurement regulation[s]." 41 U.S.C. § 1303(a)(1). It is also responsible for "manag[ing], coordinat[ing], control[ling], and monitor[ing] the maintenance of, issuance of, and changes in the Federal Acquisition Regulation." 41 U.S.C. § 1303(d). The FAR Council issued guidance that is challenged by this suit.

35.     Defendants Mathew C. Blum, Lesley A. Field, Karla S. Jackson, Jeffrey A. Koses, and John M. Tenaglia are members of the FAR Council on account of their roles in their respective agencies. They are sued in their official capacities. Defendant Blum is the Chair of the FAR Council. Defendant Field is the Acting Administrator for Federal Procurement at the Office of Federal Procurement Policy ("OFPP") in OMB. Defendant

Jackson is the Assistant Administrator for Procurement at the National Aeronautics and Space Administration. Defendant Koses is the Senior Procurement Executive at the General Services Administration. Defendant Tenaglia is the Principal Director of Defense Pricing and Contracting at the Department of Defense.

36. Defendant United States of America includes the departments and agencies thereof.

37. All of these federal government Defendants have acted in the color of federal law with their authority purportedly derived from Defendant United States of America.

38. Defendant City of Phoenix is a city in the State of Arizona. It is sued on the basis of the claims asserted against it by Plaintiffs PLEA and United Phoenix Firefighters Association Local 493 because the City is implementing the federal Defendants' Contractor Mandate.

## JURISDICTION AND VENUE

39. This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331 and 1361.

40. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201-2202.

41. Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiffs reside in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## LEGAL AND FACTUAL BACKGROUND RELATED TO VACCINE MANDATES

**Federalism And The Tenth Amendment**

42. Under principles of federalism, the federal government has only enumerated powers and not the sort of general police power reserved *solely* to the States under the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 919 (1997) ("Residual state

sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'"). "The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." The Federalist No. 45 (James Madison). Thus, the "police power" is "inherent in the states" and is "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935). It is well-settled that the power to impose vaccine mandates, if any such power exists, is part of the police powers reserved to the States. *E.g. Zucht v. King*, 260 U.S. 174, 176 (1922) ("it is within the police power of a *state* to provide for compulsory vaccination" (emphasis added)).

**The Procurement Act**

43.    The purpose of the Federal Property and Administrative Services Act (the "Procurement Act") "is to provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101. The Procurement Act allows the President to "prescribe policies and directives that the President considers necessary to carry out" the Act, but requires that such policies "be consistent with" the Act. 40 U.S.C. § 121(a). Such policies (and regulations established pursuant to them) are not valid unless there is "a nexus between the regulations and some delegation of the requisite legislative authority by Congress," and "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979).

44.     There is no such nexus when such policies are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). There is also no such nexus when such policies are imposed on subcontractors, who have "no direct connection to federal procurement" and thus do "not lie 'reasonably within the contemplation of'" the Procurement Act. *Id*. at 171–72. Furthermore, the Procurement Act does not confer on the President the power to impose policies that "conflict with another federal statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996).

**The Procurement Policy Act**

45.     The Office of Federal Procurement Policy Act ("Procurement Policy Act") requires that "a procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register ... if it—(A) relates to the expenditure of appropriated funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a). This requirement may only be "waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. § 1707(d).

46.     Under 41 U.S.C. § 1303(a), only the FAR Council has authority to "issue and maintain . . . a single Government-wide procurement regulation, . . . known as the Federal Acquisition Regulation." No other agency may issue government-wide procurement regulations. Individual executive agencies may only issue "regulations relating to procurement" that are "essential to implement Government-wide policies and procedures within the agency; and . . . additional policies and procedures required to satisfy the specific and unique needs of the agency." *Id.*

**The Emergency Use Authorization Statute**

47.     Under 21 U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction ... of a drug, device, or biological product intended for use in an actual or potential emergency" before such products receive full FDA approval. Such Emergency Use Authorizations ("EUAs") are subject to strict requirements, including that "individuals to whom the product is administered are informed ... of the **option to accept or refuse administration of the product**." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) (emphasis added). The FDA has interpreted this provision of the EUA statute to mean that "[r]ecipients ***must*** **have an opportunity to accept or refuse the EUA product** and must be informed of any consequences of refusing administration of the product" and that this right to refuse can only be waived if the President makes a specific determination in writing, and only with respect to members of the armed forces.[2] When Congress adopted the statute, it interpreted it in the same way, explaining it as "the *right* ... to refuse administration of a product."[3]

**The Major Questions Doctrine**

48.     Courts will not assume that Congress has assigned to Executive Branch questions of "deep economic and political significance" unless Congress has done so

---

[2] FDA, *Guidance Emergency Use Authorization of Medical Products*, 2007 WL 2319112, at *15 and n.16 (acknowledging that "Congress authorized the President to waive, under certain circumstances, the option for members of the armed forces to accept or refuse administration of an EUA product") (emphasis added); *see also*, FDA, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders*, OMB Control No. 0910-0595 at 24 n.46 (Jan. 2017), https://www.fda.gov/media/97321/download; 10 U.S.C. § 1107a(a) (stating that the requirements of 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III), as applied to the armed forces, "may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security"); *Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability*, 70 Fed. Reg. 5452-02, 5455 (Feb. 2, 2005) (creating EUA for anthrax vaccine for members of the armed forces, and stating that "[i]ndividuals who refuse anthrax vaccination will not be punished").

[3] H.R. Conf. Rep. No. 108-354, at 782 (2003) (emphasis added).

13

expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

49. Defendants' attempts to use the Procurement Act as justification for the contractor mandate is akin to the Federal Government's recent attempt at using the Public Health Safety Act as justification for a far-reaching nationwide eviction moratorium. That attempt was swiftly struck down by the Supreme Court, which held that "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). This is particularly so when the federal government "intrudes into an area that is the particular domain of state law." *Id.* The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* The Procurement Act contains no such language conferring on the President the authority to impose nationwide public health measures.

**Non-Statutory Causes of Action and Sovereign Immunity**

50. When "a statute . . .makes no provision for judicial review. . . .[t]hat alone, of course, is not decisive" as to whether federal courts have jurisdiction to review. "For the silence of Congress as to judicial review is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them." *Estep v. United States*, 327 U.S. 114, 119-20 (1946) (citations omitted). Thus, "[c]ourts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (citation omitted).

51.     This is true also for actions challenging executive actions as *ultra vires*: "when Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced. The passage of the APA has not altered this presumption. Prior to the APA's enactment courts had recognized the right of judicial review of agency actions that exceeded authority, and nothing in the subsequent enactment of the APA altered that doctrine of review to repeal the review of *ultra vires* actions. When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir.) *vacated on other grounds sub nom.*, *Biden v. Sierra Club*, No. 20-138, 2021 WL 2742775 (U.S. July 2, 2021) (cleaned up). Thus, "review is ordinarily available when an agency exceeds its delegation of authority," *Id.* (citing *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1325–26 (D.C. Cir. 1996)).

52.     When challenging "the President's statutory authority to issue [an] executive order," if "a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Id.* at 892 (quoting *Reich*, 74 F.3d at 1327). This is because "the responsibility of determining the limits of statutory grants of authority is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id.* (quoting *Reich*, 74 F.3d at 1327) (cleaned up). And even where a statute "expressly limit[s] judicial review . . . court[s] retain[] the ability to review whether [an agency] exceeded the authority delegated by the statute" because "the presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority." *Id.* (quoting *Dart v. United States*, 848 F.2d 217, 219, 223-34 (D.C. Cir. 1988)).

53.     Furthermore, sovereign immunity does not bar most claims for equitable relief against executive agencies because Congress "largely eliminat[ed] the federal sovereign immunity defense" when it amended 5 U.S.C. § 702 in 1976. *E. V. v. Robinson*,

906 F.3d 1082, 1092 (9th Cir. 2018). As the Ninth Circuit has explained, "[o]n its face, the 1976 amendment is an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable" and "waives sovereign immunity **in all actions seeking relief from official misconduct except for money damages**. . . .Congress stated that 'the time [has] now come to eliminate the sovereign immunity defense **in all equitable actions** for specific relief against a Federal agency or officer acting in an official capacity.'" *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) (emphasis added) (quoting H.Rep. No. 1656, 94th Cong., 2d Sess. 9, reprinted in 1976 U.S.Code Cong. & Admin.News 6121, 6129). In a non-statutory cause of action seeking equitable relief, there is no requirement that the challenged action have been final agency action under the APA. "[T]he second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's 'final agency action' limitation applies only to APA claims." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017).

54.     Furthermore, for claims that do not fall within the APA's waiver of sovereign immunity "a suit against a federal official for specific relief is not considered to be against the government, and thus is not barred by sovereign immunity, where the plaintiff alleges: (1) action by officers beyond their statutory powers or (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." *E. V.*, 906 F.3d at 1091 (cleaned up).

**Due Process Rights To Bodily Integrity And To Refuse Medical Treatment**

55.     "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). This right is rooted in "the common-law rule that forced medication was a battery, and the

long legal tradition protecting the decision to refuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997). The "rights to determine one's own medical treatment[] and to refuse unwanted medical treatment" are fundamental rights," and individuals have "a fundamental liberty interest in medical autonomy." *Coons v. Lew*, 762 F.3d 891, 899 (9th Cir. 2014) (as amended) (cleaned up).

56.    "[D]ue process ... substantively protects a person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citations omitted). Individuals thus have a "constitutional right to be free from state-imposed violations of bodily integrity." *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). A "forcible injection ... into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). The right to "bodily integrity" is "fundamental" and is "deeply rooted in this Nation's history and tradition." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). "Every violation of a person's bodily integrity is an invasion of his or her liberty. The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death. Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment." *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part).

57.    Under the unconstitutional conditions doctrine, the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them...."); *Koontz v. St. Johns River Water Mgmt. Dist.*,

570 U.S. 595, 604 (2013) ("[A]n overarching principle, known as the unconstitutional conditions doctrine, . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."). The same rule applies to government contracts. *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 678 (1996).

**Government Vaccine Mandates Are Illegal Under Arizona Law**

58.     Arizona law makes it illegal for state and local governments to impose vaccine mandates and restricts the power of private employers to impose them, including the following:

- "If an employer receives notice from an employee that the employee's sincerely held religious beliefs, practices or observances prevent the employee from taking the COVID-19 vaccination, the employer shall provide a reasonable accommodation unless the accommodation would pose an undue hardship and more than a de minimus cost to the operation of the employer's business." A.R.S. § 23-206.

- "No person shall be required by this state, or any city, town or county to obtain a COVID-19 vaccine. . . ." Arizona Executive Order 2021-19; *see also Yes on Prop 200 v. Napolitano*, 215 Ariz. 458, 467 ¶ 27 (Ariz. Ct. App. 2007) (in Arizona, "the Governor has the power to supervise executive branch officials," and "a Governor's order is binding on lower executive branch officials") (citations omitted)).

- "Any county, city, town or political subdivision official that implements a vaccine mandate contrary to the authorities outlined in this order, is in violation of A.R.S. §§ 36-114 and 36-184 and such actions are punishable by a class 3 misdemeanor and subject to legal action by individuals for violation of their rights under Arizona law." Arizona Executive Order 2021-18.

- Arizona's public health statute specifically forbids "impos[ing] on any person against his will any mode of treatment, provided that sanitary or preventive measures and quarantine laws are complied with by the person." A.R.S. § 36-114 and -184(C).

**The Vaccine Development And Approval Process**

59.  According to the CDC, usually "[v]accine licensing is a lengthy process that can take 10 years or longer" that involves "three phases of clinical trials with human subjects before they can be licensed for use in the general public."[4] A Phase 3 trial is the final phase before a vaccine is approved and involves a much larger test group than the first two phases. "Typically, these [phase 3] trials last several years" to allow researchers time to compare vaccine recipients "to those who have not received the vaccine" and thus discover potential side effects of the vaccine.[5]

60.  Vaccines that have not yet been fully approved by the FDA may be approved under an Emergency Use Authorization that is less rigorous than the full approval process. For example, the FDA typically only requires two months' worth of data from Phase 3 trials to approve an EUA.[6]

61.  The FDA's process for full approval of COVID-19 vaccines has been significantly accelerated. For example, the Phase 3 trial data that the FDA used to grant "approval of the [Pfizer] COMIRNATY [vaccine] included participants 16 years of age and older who had been enrolled from July 27, 2020, and who were followed for ... follow-up through as late as March 13, 2021."[7] The FDA thus required less than eight months of

---

[4] CDC, *Vaccine Safety: Overview, History, and How the Safety Process Works*, https://www.cdc.gov/vaccinesafety/ensuringsafety/history/index.html, (accessed Oct. 18, 2021).

[5] *Id.*

[6] FDA, *Emergency Use Authorization for Vaccines Explained*, https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (accessed Oct. 18, 2021).

[7] FDA, Vaccines and Related Biological Products Advisory Committee September 17, 2021 Meeting Briefing Document, https://www.fda.gov/media/152176/download, (accessed Oct. 18, 2021).

19

Phase 3 trial data, rather than the period of several years normally used to observe side effects and adverse events.

**Biden Administration Response to COVID-19**

62. On January 20, 2021 President Biden signed an Executive Order ("EO") 13991 (86 Fed. Reg. 7045), which established the Safer Federal Workforce Task Force ("SFWTF") and tasked it with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed. Reg. at 7046. The SFWTF is headed by three co-chairs: (1) the Director of OPM; (2) the Administrator of GSA; and (3) the COVID–19 Response Coordinator. The Director of OPM is also a member of the SFWTF. The EO also required that GSA "provide funding and administrative support for the" SFWTF. *Id*.

63. On September 9, 2021, President Biden announced his "new plan to *require* more Americans to be vaccinated" by imposing "new vaccination *requirements*" that "*require* all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week." He also announced plans to "*requir*[*e*] vaccinations" of "those who work in hospitals, home healthcare facilities, or other medical facilities — a total of 17 million healthcare workers." He further announced that he would "sign an executive order that will now *require* all executive branch federal employees to be vaccinated — all. And I've signed another executive order that will *require* federal contractors to do the same." And finally, he announced that he would "*require* all of nearly 300,000 educators in the federal paid program, Head Start program" to get vaccinated.[8]

---

[8] *Supra* n. 1 (emphasis added).

64.     President Biden listed as one of the main justifications for his new COVID mandates that "the FDA granted ... approval" for the COVID—19 vaccine and "[s]o, the time for waiting is over."[9]

65.     In reality, however, only the Pfizer Comirnaty vaccine—just one of the three COVID-19 vaccines subject to President Biden's COVID-19 vaccine mandate—has been approved by the FDA. The other two available COVID-19 vaccines (manufactured by Moderna and by Johnson & Johnson) are not FDA-approved and are only available under EUAs.

66.     Additionally, upon information and belief, the Comirnaty vaccine is not currently being distributed in the United States. For example, an NIH notice from September 13, 2021 states that "[a]t present, Pfizer does not plan to produce any [Comirnaty] product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution."[10] The only Pfizer COVID-19 vaccine actually available in the United States is the prior Pfizer–BioNTech COVID-19 version that is also only available pursuant to an EUA. Therefore, the only three COVID-19 vaccines available in the United States to satisfy President Biden's vaccine demands are vaccines available only under EUAs, and which are therefore subject to the requirements of 21 U.S.C. § 360bbb-3.

67.     Following President Biden's remarks, the White House released a webpage with further information about Defendants' "COVID Plan." The White House stated that "[t]he Department of Labor's Occupational Safety and Health Administration (OSHA) ... will issue an Emergency Temporary Standard (ETS) to implement" the requirement that "all employers with 100 or more employees to ensure their workforce is fully vaccinated

_____

[9] *Id.*

[10] National Institutes of Health, "Pfizer received FDA BLA license for its COVID-19 vaccine," *DailyMed, U.S. National Library of Medicine*, (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (accessed Oct. 20, 2021)

or require any workers who remain unvaccinated to produce a negative test result on at least a weekly basis." The White House webpage also stated that the Centers for Medicare & Medicaid Services (CMS) would "require COVID-19 vaccinations for workers in most health care settings that receive Medicare or Medicaid reimbursement..., apply[ing] to approximately 50,000 providers and cover[ing] a majority of health care workers across the country."[11]

68.     Even though natural immunity from prior COVID-19 infection is better than, or at least no worse than, immunity conferred by the vaccine,[12] Defendants have failed to provide for any exemptions for persons who have already been infected with COVID-19.

69.     Before September 2021, Defendants' consistent position had been that the federal government *lacks* the authority Defendants are now claiming to possess. For example, at a July 23, 2021 press briefing, Psaki acknowledged that imposing vaccine mandates is "not the role of the federal government; that is the role that institutions, private-sector entities, and others may take.... What our role is and what we are going to continue to do is make the vaccine available. We're going to continue to work in partnership to fight misinformation. And we're going to continue to advocate and work in

---

[11] https://www.whitehouse.gov/covidplan/ (accessed Sept. 10, 2021)

[12] *E.g.*, Sivan Gazit, et al., "Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections," *medRxiv*, Aug. 25, 2021, https://doi.org/10.1101/2021.08.24.21262415 ("This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity."); Kristen W. Cohen, et al., "Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells," *Cell Reports Medicine*, July 14, 2021, https://doi.org/10.1016/j.xcrm.2021.100354 ("Here, we evaluate 254 COVID-19 patients longitudinally up to 8 months and find durable broad-based immune responses.").

partnership with local officials and — and trusted voices to get the word out."[13] Similarly, on December 4, 2020, in response to a question about whether COVID-19 vaccines should be made mandatory, then-President-Elect Biden said "[n]o, I don't think it should be mandatory. I wouldn't demand it to be mandatory."[14]

**The Contractor Mandate**

70.     On September 9, 2021, President Biden signed EO 14042 imposing on federal contractors "COVID [s]afety [p]rotocols" to be established and issued by the SFWTF by September 24, 2021.[15] The EO did not explicitly make any provision for religious or medical exemptions to the "safety protocols." While EO 14042 did not specifically call for a vaccine mandate, it did purport to delegate rulemaking authority to the SFWTF, OMB, and the Federal Acquisition and Regulatory Council (the "FAR Council").

71.     On September 24, 2021 the SFWTF released on its website guidance to federal agencies for implementing Defendants' vaccine mandate on contractors and subcontractors (the "Contractor Mandate").[16] This guidance was never published to the Federal Register for public comment. Among other things, the guidance included the following:

---

[13] Jen Psaki, White House Press Briefing (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/ (accessed Sept. 28, 2021)

[14] Jacob Jarvis, "Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?," *Newsweek* (Sept. 10, 2021), https://www.msn.com/en-us/news/politics/fact-check-did-joe-biden-reject-idea-of-mandatory-vaccines-in-december-2020/ar-AAOiq5S.

[15] Exec. Order No. 14042, 86 Fed. Reg. 50985, "Ensuring Adequate COVID Safety Protocols for Federal Contractors," (Sept. 9, 2021).

[16] SFWTF, "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," (Sept 24, 2021), https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20210922.pdf (accessed Oct. 21, 2021).

- A deadline of December 8, 2021 for "covered contractor employees" to be fully vaccinated.

- A deadline of November 24, 2021 for employees of contractors or subcontractors to receive their final vaccination (or only vaccination, in the case of the Johnson & Johnson vaccine), because the guidance defines "fully vaccinated" to mean two weeks after receiving the requisite number of doses of an approved COVID-19 vaccine. The guidance defines "fully vaccinated" to include vaccines approved only by EUA.

- A definition of the term "covered contractor employee" to "include[] employees of covered contractors who are not themselves working on or in connection with a covered contract" if they are working at the same location, thus imposing vaccine requirements on employees of contractors and subcontractors who are not even working on federal contracts.

- A requirement that the Federal Acquisition Regulatory Council ("FAR Council") conduct rulemaking to amend the Federal Acquisition Regulation ("FAR") to impose the Contractor Mandate.

- A deadline of October 8, 2021 for the FAR Council to develop a contract clause to implement the Contractor Mandate for agencies to include in contracts. The guidance also instructs the FAR Council to "recommend that agencies exercise their authority to deviate from the FAR" and use the vaccination mandate clause in contracts even before the FAR is amended.

- A deadline of October 15, 2021 for agencies to include that contractual clause in solicitations

- A deadline of November 14, 2021 after which awarded contracts must include that contractual clause. For contracts entered into between October 15 and November 14

and for which the solicitation was issued before October 15, the guidance states that agencies are encouraged to include the clause, but are not required to do so.

- A requirement that, for contracts awarded "prior to October 15 and where performance is ongoing", the vaccine mandate clause "must be incorporated at the point at which an option is exercised or an extension is made."

- Requirements that the Contractor Mandate must apply even to: 1) persons who have already been infected with COVID-19; 2) workplace locations that are outdoors; and 3) contractor employees who are working remotely full time.

- A statement asserting that the guidance supersedes legal requirements in States or localities that prohibit vaccine mandates.

72.     On September 28, 2021, Shalanda Young, the Acting Director of the Office of Management and Budget published a notice in the Federal Register[17] in which Ms. Young made the conclusory contention that "compliance with COVID–19-related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." She further stated that she had "determined that compliance by Federal contractors and subcontractors with the COVID–19-workplace safety protocols detailed in [the SFWTF] guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."

73.     Ms. Young did not cite to any information or evidence that would support the claims in her determination, nor did she explain how she reached her conclusion. Nor did she mention, much less explain, why she had rejected any other alternatives, such as weekly testing or exemptions for persons naturally immune to COVID-19 because of a prior infection. Furthermore, Ms. Young's notice was not subject to public commenting.

---

[17] 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021).

Notably, however, Ms. Young's determination did not claim there were any urgent and compelling circumstances in this case, and her Federal Register notice did not include a 41 U.S.C. § 1707(d) waiver of the Procurement Policy Act requirement that a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register. Nor did Ms. Young's notice invoke the good cause exception (5 U.S.C. § 553(b)(3)(B)) to the APA's notice-and-comment requirements.

74. On September 30, 2021, the FAR Council issued Class Deviation Clause 252.223-7999 (the "FAR Deviation Clause"), along with accompanying guidance. The FAR Deviation Clause cites EO 14042 as the single authority for the deviation and contains little substantive content other than requiring federal contractors to follow SFWTF Guidance posted on the SFWTF website at https:/www.saferfederalworkforce.gov/contractors and to follow any future amendments to the guidance posted on the SFWTF website. In issuing the FAR Deviation Clause, the FAR Council did not provide notice or opportunity for public comment, as required by 41 U.S.C. § 1707. A true and correct copy of the FAR Deviation Clause and guidance is attached as Exhibit 1.

75. A deviation is a clause that is inconsistent with the FAR. FAR § 1.401. The FAR prescribes procedures for making individual deviations and class deviations. *Id*. §§ 1.403-04. Deviations are not an appropriate method for implementing a government-wide procurement policy, and "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision." *Id*. § 1.404.

76. On November 10, 2021, the SFWTF issued updated contractor guidance.[18] The updated guidance substantially follows the prior guidance and is attached hereto as Exhibit 2. Among other things, the new guidance omits the previous guidance's

---

[18] https://www.saferfederalworkforce.gov/downloads/Guidance%20for%20Federal%20Contractors_Safer%20Federal%20Workforce%20Task%20Force_20211110.pdf

"Frequently Asked Questions" ("FAQ") section and instead provides a link to a new version of the SFWTF contractor FAQ on the SFWTF website, at https://www.saferfederalworkforce.gov/faq/contractors/. Attached as Exhibit 3 is a true and correct copy of the SFWTF contractor FAQ that was captured on November 19, 2021.

77. On November 10, 2021, Defendant Young, Acting Director of the OMB, issued for publication in the Federal Register a notice titled "Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis." The notice was published in the Federal Register on November 16, 2021. 86 Fed. Reg. 63418 (Nov. 16, 2021). Attached as Exhibit 4 is a true and correct copy of that notice (the "Second OMB Notice"). The Second OMB Notice attempts to justify the Contractor Mandate as promoting economy and efficiency in procurement. It also re-publishes the SFWTF contractor guidance of November 10, 2021. It also disclaims the applicability of the notice-and-comment requirements of 41 U.S.C. § 1707 and of the APA, but also claims that if they do apply, "urgent and compelling circumstances" justify departure from the requirements of Section 1707, and the "good cause" exception applies to the APA's requirements.

78. The Second OMB Notice makes only a weak, pretextual attempt to establish a nexus with economy and efficiency. Indeed, before it makes any mention of economy and efficiency, or even of procurement at all, it explicitly states that its actual main objective is to achieve public health goals, specifically, "to get more people vaccinated." 86 Fed. Reg. at 63418. It claims, without evidence, that the Contractor Mandate will "decrease worker absence, reduce labor costs, and improve the efficiency of contracts and subcontractors. *Id.* It further makes the circular argument that, because some private businesses have imposed vaccine mandates, those private businesses' vague justifications somehow also justify the federal government's vague justifications *Id.* at 63421. This

reasoning is upside-down, however, as the vast majority of businesses in the United States do *not* impose vaccine mandates. *See infra* ¶ 99. The fact that only a minority of businesses impose vaccine mandates thus reveals the pretextual nature of Defendants' economy and efficiency claims. Furthermore, the Second OMB Notice claims that the Contractor Mandate will reduce the spread of COVID-19, yet the only evidence it cites in support of this claim is a study that was conducted before the Delta variant of COVID-19 became dominant and made no findings as to reductions in infection, but only found the Pfizer and Moderna vaccines reduce the severity of COVID-19 infection.[19]

79.     The Second OMB Notice acknowledges that the Contractor Mandate will impose costs from "employees quitting" and also from "side effects from vaccination." *Id.* at 63422. The Notice, however, makes no attempt to quantify these costs, and instead handwaves them away, claiming without evidence, that "we expect few employees to quit" and that vaccine side effects will be less costly than COVID-19 infection. *Id.* It claims that there are only "anecdotal reports" of employees quitting because of the Contractor Mandate and that "we know of no systematic evidence that this has been a widespread phenomenon, or that it would be likely to occur among employees of federal contractors." *Id.* OMB *did* have, however "systematic evidence" that imposing the Contractor Mandate would likely lead to loss of employees. The First Amended Complaint ("FAC") in this case cited such evidence. *See, e.g.*, Doc 14 ¶ 83. The FAC was served by certified mail on Defendant Young and on OMB, who both received it on November 1. (*See* Doc. 61 at 16 and 22.).

80.     The Second OMB Notice was also deficient in that it did not contain the full SFWTF contractor guidance that is binding on contractors who accept contracts with the

---

[19]Mark W. Tenforde, et al., "Sustained Effectiveness of Pfizer-BioNTech and Moderna Vaccines Against COVID-19 Associated Hospitalizations Among Adults — United States, March–July 2021," 70 Morbidity and Mortality Weekly Report Aug. 27, 2021, pp. 1156–1162, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8389395/ (finding that "[p]rotection against severe COVID-19 resulting in hospitalization was sustained through 24 weeks after vaccination with mRNA COVID-19 vaccines" and that "[c]ontinued monitoring of [vaccine effectiveness] against infection and severe disease is needed as the elapsed time since vaccination increases and new SARS-CoV-2 variants emerge").

FAR Deviation Clause. The Clause requires that "[t]he Contractor shall comply with all guidance, **including guidance conveyed through Frequently Asked Questions**, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/." The Second OMB Notice did not contain the FAQ, which is only posted on the SFWTF website and is subject to change at any time.

81.     The omission of the FAQ is significant, as most of the sweeping reach of the Contractor Mandate is only made clear in the FAQ. For example, the FAQ clarifies that the Contractor Mandate applies to "[e]mployees who perform duties necessary to the performance of the covered contract, but who are not directly engaged in performing the specific work called for by the covered contract, such as human resources, billing, and legal review." Exhibit 3 at 12-13. Thus, employees who never work directly on a federal contract; who never directly work with an employee working on a federal government contract; or who never work in the same building or location as an employee who works directly on a federal government contract are subject to the Contractor Mandate. The FAQ also shows the sweeping breadth of the "locations" to which the Guidance applies. For example, it is in the FAQ that Defendants state that the Contractor Mandate applies "to contractor or subcontractor workplace locations that are outdoors." *Id.* at 9. It is also in the FAQ where Defendants command that even if a contractor's employee works in an entirely separate floor or area or even building or site, the employee is working in a "covered contractor workplace" "unless a covered contractor can affirmatively determine that none of its employees" in the separate area "will come into contact with a covered contractor employee." *Id.* at 9-10. "Contact," the FAQ continues, includes "interactions" in "common areas such as lobbies, security clearance areas, elevators, stairwells, meeting rooms, kitchens, dining areas, and parking garages." *Id.* And the FAQ is where it is stated that if

an employee is working completely remotely, but working on a covered federal contract, the employee still "must comply with the vaccination requirement ... even if the employee never works at either a covered contractor workplace or Federal workplace during the performance of the contract." *Id*. at 10. Thus, it is through the FAQ, which has still never been published for notice and comment, that Defendants impose the most authoritarian and sweeping aspects of the Contractor Mandate, ensnaring within its grasp almost any employee of an organization with any kind of federal contract.

**Federal Attempts To Impose The Contractor Mandate On Arizona**

82.     Federal authorities have already demanded that multiple Arizona State agencies, including public universities, implement the Contractor Mandate and require that their employees receive the COVI-19 vaccine. This creates a significant conflict, as mandates are illegal under State law. *See* ¶ 58.

83.     The Arizona Board of Regents ("ABOR") oversees the management, direction, and governance of Arizona's three public universities: Arizona State University, Northern Arizona University, and the University of Arizona. All three universities are federal contractors, and for Fiscal Year 2021, their total federal revenues were $1,207,926,800. Because they face the significant harm of losing more than a billion dollars if they do not submit to the Contractor Mandate, ABOR and the three universities have been actively engaged in efforts to comply with the Contractor Mandate. Attached as Exhibit 5 is a signed declaration from John Arnold, who is ABOR's Executive Director that details these facts.

84.     On October 18, 2021, Defendant GSA sent an email to the Arizona State Retirement System ("ASRS") demanding that ASRS implement the Contractor Mandate on its employees. Statewide, ASRS has approximately 220 full-time equivalent employees and 20 to 30 part-time contractors who would potentially be subject to the Contractor

Mandate. *See* Doc. 48-4, Declaration of Dawn Northup, which is hereby incorporated by reference.

85.     On November 2, 2021, the Equal Employment Opportunity Commission ("EEOC") requested that the Division of Civil Rights Section ("DCRS") of the Arizona Attorney General's Office ("AGO") renew a contract and workshare agreement whereby EEOC provides about $500,000 of funding to DCRS. However, the day before, on November 1, 2021, EEOC had stated that "when the . . . contracts are executed, the requirements of . . . Executive Order [14042] may take effect." Statewide, the AGO has 1,010 employees who would potentially be subject to the Contractor Mandate. *See* Doc. 48-3 and 58-1, the First and Second Declarations of Rebekah Browder, which are hereby incorporated by reference.

86.     The Arizona Department of Transportation ("ADOT") owns property that it leases to the General Services Administration ("GSA") for use by the Federal Motor Carrier Safety Administration. The property is a port of entry in Nogales, Arizona, designated as "State Port Annex" at N. Mariposa Road. GSA sent to ADOT a letter dated October 14, 2021 stating that a contract modification imposing a vaccine mandate "is ***mandatory*** and your acceptance is required in order to ensure compliance with E.O. 14042" and that contract "modifications must be finalized by **November 14, 2021**." (emphasis in original.) Statewide, ADOT has approximately 3,650 employees who would potentially be subject to the Contractor Mandate. Attached as Exhibit 6 is the Declaration of Sonya Herrera, who is the Director of the Administrative Services Division of ADOT, further detailing these facts.

87.     On October 22, 2021, the CDC sent an email to the Arizona Department of Health Services ("ADHS") demanding that ADHS implement the Contractor Mandate and requiring that ADHS "sign and return the modification via email to the Contracting Officer of record by November 9, 2021." Attached to the email was a spreadsheet that listed

covered contracts that CDC claimed were subject to its demand. Among those were two ADHS contracts with the CDC with a total value of approximately $520,000. Statewide, ADHS has approximately 1,500 employees who would potentially be subject to the Contractor Mandate. Attached as Exhibit 7 is a signed declaration from Kevin Ray, who is Education and Health Section Chief Counsel in the State Government Division of the Office of the Attorney General of Arizona, further detailing these facts.

88. The Arizona Department of Public Safety ("DPS") has a contract with the National Park Service ("NPS") to provide laboratory testing. On November 2, 2021, NPS sent an email to DPS demanding that DPS sign a contract modification to incorporate the Contractor Mandate. Statewide, DPS has approximately 2,100 employees who would potentially be subject to the Contractor Mandate. Attached as Exhibit 8 is the Declaration of Daniel Bergin, who is Transportation Section Chief Counsel in the State Government Division of the Office of the Attorney General of Arizona, further detailing these facts.

89. The Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") has a contract with the U.S. Forest Service through which inmates perform work on Forest Service land. On September 28, 2021, Jeremy Plain, District Ranger for the Tonto National Forest, sent an email to personnel at ADCRR stating that persons performing under the contract would be required to comply with new COVID-19 "safeguards," including mandatory "vaccine certification." The email concluded by stating that "[w]e are very thankful for the work that the AZDOC crews provide for us and we would like to continue utilizing them, but we have to follow the above policy." On November 15, 2021, Kristine Yaw, Deputy Chief Procurement Officer at ADCRR, sent a letter to Mr. Plain stating that ADCRR "cannot facilitate the requirements at this time." Statewide, ADCRR has approximately 9,500 full-time equivalent employees who would potentially be subject to the Contractor Mandate. Attached as Exhibit 9 is the Declaration

of Denel Pickering, who is the Chief Procurement Officer of ADCRR, further detailing these facts.

**The City of Phoenix And The Contractor Mandate**

90.     On November 18, 2021, Defendant City of Phoenix, citing the Contractor Mandate, issued a notification informing its employees that they would be required to receive the COVID-19 vaccine by January 18, 2022 or face discipline, up to and including termination. Attached as Exhibit 10 is the Declaration of Michael Napier, which includes a copy of the notification from the City of Phoenix.

91.     The imposition of a vaccine mandate by Defendant City of Phoenix is in violation of Arizona law, specifically A.R.S. §§ 23-206, § 36-114, and -184(C), and Arizona Executive Orders.2021-18 and -19.

92.     Upon information and belief, a significant number of rank and file police officers and firefighters of Defendant City of Phoenix have expressed concerns over the mandate and will refuse to be vaccinated. These officers and firefighters will face significant discipline, up to and including termination.

**The Federal Employee Mandate**

93.     On September 9, 2021 President Biden also signed an EO requiring that "[e]ach agency shall implement ... a program to *require* COVID-19 vaccination for all of its Federal employees" (the "Employee Mandate").[20] The EO required the SFWTF to issue guidance for agencies by September 16, 2021, and made no explicit provision for any religious or medical exemptions to the vaccination requirement.

94.     On September 16, 2021 the SFWTF updated the "Frequently Asked Questions" ("FAQ") section of its website,[21] ostensibly in an attempt to fulfill the EO's guidance requirement. Among other things, the updated FAQ included the following:

---

[20] Exec. Order No. 14043, 86 Fed. Reg. 50989, "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," (Sept. 9, 2021) (emphasis added).
[21] https://www.saferfederalworkforce.gov/faq/vaccinations/

- A deadline of November 22, 2021 for federal employees to be "fully vaccinated" and also after which new federal employees would need to be fully vaccinated before starting work.

- A deadline of November 8, 2021 for employees to receive their final vaccination (or only vaccination, in the case of the Johnson & Johnson vaccine), because the FAQ defines "fully vaccinated" to mean "2 weeks after [employees] have received the requisite number of doses of a[n approved] COVID-19 vaccine." The FAQ defines "fully vaccinated" as including vaccines approved only by EUA.

- Imposition of the Employee Mandate 1) for federal employees who are working remotely full-time and thus do not pose any risk of exposing other federal employees to COVID-19 and 2) for federal employees who have already been infected with COVID-19 and thus already have natural immunity.

- A warning to agencies to allow exemptions from the Employee Mandate only "in *limited circumstances* where the law requires an exception." (emphasis added).

95. Attached as Exhibit 11 is a copy of the updated employee FAQ that was captured on November 19, 2021. On information and believe, the SFWTF has never issued official, formal guidance to agencies; has never published its guidance in the Federal Register; and has not followed any notice-and-comment procedures before issuing its guidance.

**The Mandates Will Have Deep Economic And Political Significance**

96. The U.S. Department of Labor recognizes that "workers employed by federal contractors" comprise "approximately **one-fifth of the entire U.S. labor force**."[22] Upon information and belief, this approximately reflects the proportions of the labor force in Arizona subject to the Contractor Mandate.

---

[22] DOL, History of Executive Order 11246, Office of Contract Compliance Programs, https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (last visited Nov. 17, 2021) (emphasis added).

34

97.     Upon information and belief, the vaccination mandates will cause a significant proportion of unvaccinated federal and contractor employees to resign to avoid the mandates. The Society for Human Resource Management conducted a survey of businesses subject to Defendants' Mandates and found that "85 percent said the anticipated requirement will make retaining employees more difficult. Eighty-nine percent said some of their employees will quit due to the new mandate."[23] Similarly, a leading trade publication covering the construction industry has predicted that more than 40% of employees in the construction industry, "when faced with the choice between the vaccine and their job with a federal contractor, will quit and go to work for another contractor that does not have such a mandate"[24] In a tight labor market, these resignations will greatly hurt productivity of the federal workforce and thus impair economy and efficiency.

98.     A recent survey from the Kaiser Family Foundation found that 72 percent of unvaccinated workers say that they will quit rather than submit to a vaccine mandate.[25]

99.     Before Defendants announced their planned mandates, only 16% of a sample of 400 large employers had imposed COVID-19 vaccine mandates. After Defendants announced their mandate plans, an additional 9% of the employers imposed mandates and 13% developed future plans to impose mandates. Thus, as of October 1, 2021, only a 25% minority of large employers imposed vaccine mandates, and 60% had no plans to impose

---

[23] Allen Smith, "Survey: Vaccine-or-Testing Mandate Will Be Difficult to Implement," Society for Human Resource Management, (Oct. 15, 2021), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/coronavirus-survey-vaccine-testing-mandate-challenges.aspx

[24] Engineering News-Record, "How Will President Biden's Vaccine Workplace Mandate impact you and your company?." (Sept. 23, 2021), https://www.enr.com/articles/52467-temperature-check-president-bidens-vaccine-workplace-mandate (accessed Sept. 24, 2021).

[25] Chris Isidore et al., "72% of unvaccinated workers vow to quit if ordered to get vaccinated," CNN (Oct. 28, 2021), at https://www.cnn.com/2021/10/28/business/covid-vaccine-workers-quit/index.html.

a mandate. Additionally, the employers said they expected to lose 2% and 8% of their employees because of vaccine mandates, either from employee resignations or terminations.[26] Upon information and belief, the percentage of small business that impose vaccine mandates, or that plan to impose such mandates, is even lower than 25%.

100.   This employee resistance and sensitivity of the issues presented here was further evidenced by the recent experience of Southwest Airlines Company. Southwest Airlines had to cancel over 2000 flights over ten days in October as pilots refused to work in the wake of the company's vaccine mandate and the pilot's union's suit to stop it.[27] "The key driver for such cancellations is likely the COVID-19 vaccine mandate for its employees. Southwest employees are expressing their concern in droves by simultaneously and strategically using their sick time benefits."[28] What's more, estimates indicated that such massive impact can be felt by the action of "just over 2 percent of their employees being unavailable. This illustrates how vulnerable the airline is to organized worker shortages even among a small group of potentially disgruntled employees."[29] And the company would not have put a vaccine requirement in place but for the Biden administration's mandate, as Southwest's CEO Gary Kelly has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been."[30]

---

[26] Matthew Boyle, "1 in 4 Large Firms Has Vaccine Mandate for Employees, With More Coming: Gartner," *Insurance Journal* (Oct. 1, 2021), at https://www.insurancejournal.com/news/national/2021/10/01/634795.htm.

[27] Sheldon H. Jacobson, *Southwest Airlines debacle is symptomatic of bigger pandemic problems*, The Hill, Oct. 18, 2021, https://thehill.com/opinion/healthcare/577248-southwest-airlines-debacle-is-symptomatic-of-bigger-pandemic-problems?rl=1.

[28] *Id*.

[29] *Id.*

[30] Emily Crane, *Southwest CEO says he's against vaccine mandates, blames Biden*, New York Post, Oct. 12, 2021, https://nypost.com/2021/10/12/southwest-ceo-gary-kelly-blames-biden-for-vaccine-mandate

In addition to being consumer airlines, "Southwest Airlines and American Airlines are among the carriers that are federal contractors and subject to" the government contractor mandate, so their employees may not utilize "regular Covid testing as an alternative to a vaccination" as other large, non-contractor business employees may.[31] And while the airline claimed weather and air traffic control issues as its official justification for the unprecedented disruption in service, it was telling that in response, it dropped one of its major enforcement mechanisms for the mandate: forced unpaid leave.[32]

101. According to Gallup, "[j]ust under one in five U.S. adults, 18%, can be described as vaccine resistant. These Americans say they would not agree to be vaccinated if a COVID-19 vaccine were available to them right now at no cost and that they are unlikely to change their mind about it. The percentage holding these views has been stable in recent months."[33]

102. On average, federal government spending accounts for 20% to 25% of the U.S. economy, and has been even higher during the COVID-19 pandemic. Furthermore, by Defendants' own estimates, the contractor and subcontractor mandates will affect "millions" of individuals.[34] Defendants' vaccine mandates thus have deep economic and political significance.

---

[31] Leslie Josephs, *Southwest drops plan to put unvaccinated staff on unpaid leave starting in December*, CNBC, Oct. 19, 2021, https://www.cnbc.com/2021/10/19/southwest-vaccine-mandate-unpaid-leave-exemptions.html

[32] *Id.*

[33] Jeffrey M. Jones, *About One in Five Americans Remain Vaccine Resistant*, Gallup (Aug. 6, 2021), https://news.gallup.com/poll/353081/one-five-americans-remainvaccine-resistant.aspx (last visited Nov. 16, 2021).

[34] https://www.whitehouse.gov/covidplan/ (characterizing EO 14042 as a plan "[r]equiring [v]accinations for ... [m]illions of [c]ontractors")

**The Vaccine Mandates Harm The State Of Arizona**

103.    Defendants' actions directly injure the State's sovereign, quasi-sovereign, and proprietary interests by denying Arizona residents of the benefit of the Due Process Clause.

104.    Furthermore, because State agencies and political subdivisions qualify as "government contractors," *see* ¶ 82-89, the Contractor Mandate will harm the State of Arizona in three ways. First, by requiring the State to violate the Constitution and Federal and State law, *see* ¶¶ 42-58 and 148-213, or face the loss of federal funds and contracts. Second, by causing State employees subject to the mandate to resign. In the current tight labor market, this will cause significant harm to the State's operations through the loss of institutional knowledge and human capital. It will also cause the State to incur significant recruitment, on-boarding, and training costs to replace lost employees. Third, because vaccine mandates and public health more generally, are part of the police power reserved to the States under the Tenth Amendment, the vaccine mandates harm the State's sovereign interests and concern in defending its statutes and seeing that they are faithfully executed.

105.    On information and belief, a natural and predictable consequence of the Contractor Mandate is that numerous employees may be fired, retire, or quit their jobs, including employees of businesses within the State. This injures the State's quasi-sovereign interest in the economic well-being of its citizens. It further injures the State in that it will likely increase the burden on the State's unemployment insurance funds, and it will inflict economic disruption on the State's economy as a whole.

106.    On information and belief, a natural and predictable consequence of the Contractor Mandate is that employers who are critical to the supply chain, and are also federal contractors, will likely lose significant numbers of employees. It is entirely predictable, therefore, that the Contractor Mandate will exacerbate current supply chain issues. As a result, prices will continue to rise and cause direct injuries to the State as a

purchaser. It will also harm its quasi-sovereign interest in the economic well-being of its residents, who will suffer from further supply chain disruptions.[35]

107.    Because the Contractor Mandate claims to supersede all contrary State law Ex. 3 at 15, it injures Arizona's interest in setting its own laws regarding public health and workplace issues that would otherwise apply to contractors within Arizona's borders, as well as preempting State religious-liberty protections under the State Constitution and State statute.

108.    The Contractor Mandate requires employees to prove vaccination status with documentation, and on information and belief, agencies of the State often possess such documentation. A predictable consequence of the Contractor Mandate is thus to increase the number of people seeking documentation from the Plaintiff States regarding vaccination status. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). On information and belief, that will increase costs to the State.

109.    The combination of these effects injures the State's sovereign, quasi-sovereign, and proprietary interests.

**The Vaccine Mandate Harms Plaintiff John Doe**

110.    Because Plaintiff John Doe is not eligible for a religious exemption and because his medical exemption will almost certainly be denied, he will either be subject to dismissal from his employment, or will suffer serious violations of his constitutional rights to bodily integrity and to refuse medical treatment. Furthermore, the vaccine mandate will infringe his right under the EUA statute to refuse the vaccines.

**The Vaccine Mandate Harms Plaintiff PLEA and United Phoenix Firefighters Association Local 493, and Their Members**

---

[35] *See* Spencer Kimball, "Business Croups Ask White House to Delay Biden COVID Vaccine Mandate Until After the Holidays," CNBC (Oct. 25, 2021), https://www.cnbc.com/2021/10/25/businesses-ask-white-house-to-delay-biden-covid-vaccine-mandate-until-after-holidays.html ("Worried that President Joe Biden's Covid vaccine mandate for private companies could cause a mass exodus of employees, business groups are pleading with the White House to delay the rule until after the holiday season.").

111. Plaintiffs PLEA and United Phoenix Firefighters Association Local 493, as well as their members, are faced with a Catch-22 of either facing significant discipline, up to and including termination, or having to suffer serious violations of their constitutional rights to bodily integrity and to refuse medical treatment. Furthermore, the vaccine mandate will infringe their rights under the EUA statute to refuse the vaccines.

**ADDITIONAL LEGAL AND FACTUAL BACKGROUND RELATED TO CLAIMS REGARDING CERTAIN DEFENDANTS' PAROLE POLICIES[36]**

112. Driven by President Biden's campaign promises of lax immigration enforcement and loose border security, Defendants have created a crisis at the southern border leading to an unprecedented wave of unlawful immigration into the U.S.

113. Furthermore, federal immigration law requires that all arriving aliens, even those claiming asylum, be detained pending a decision as to whether they have a valid basis to enter the United States. *See* 8 U.S.C. § 1225(b)(2)(A); id. § 1225(b)(1)(B). This requirement applies "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. *Id*. § 1225(a)(1)

114. As the Supreme Court recently explained, there is only one "circumstance[] under which" these arriving aliens "may be released" from detention: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

---

[36] Because the allegations in this portion of the Complaint (Paragraphs 112-147) relate only to claims brought by Plaintiffs Brnovich and the State of Arizona, they are only being asserted by those Plaintiffs, and the other Plaintiffs take no position as to these paragraphs.

115.    The Biden Administration is ignoring these requirements. It has released at least 225,000 illegal border crossers since taking office,[37] including "[a]bout 50,000" whom the government released without initiating immigration court proceedings as required by law.[38] This practice was apparently authorized by "[g]uidance sent to border patrol ... from agency leadership," which has not been made public, and which appears to claim broad "prosecutorial discretion" to ignore the requirements of the immigration laws.[39]

116.    Defendants' favorable treatment of unauthorized aliens appears to be having an effect. As Table 1 (taken from Defendants' own website) shows, DHS encounters with unauthorized aliens are at their highest level in years, and continually increasing.

---

[37] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[38] https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[39] https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html

**Table 1: CPB Encounters With Unauthorized Aliens By Month**



Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

117. Recent reporting has confirmed DHS's own statistics: "U.S. authorities detained more than 1.7 million migrants along the Mexico border during the 2021 fiscal year that ended in September, and arrests by the Border Patrol soared to the highest levels

ever recorded, according to unpublished U.S. Customs and Border Protection data obtained by The Washington Post."[40]

118.　While the Biden Administration has offered an array of shifting excuses, those have continually been disproved, for example: "Illegal crossings began rising last year but skyrocketed in the months after President Biden took office. As CBP arrests increased this past spring, Biden described the rise as consistent with historic seasonal norms. But the busiest months came during the sweltering heat of July and August, when more than 200,000 migrants were taken into custody."[41]

**The Immigration And Nationality Act**

119.　"[T]he Immigration and Nationality Act ("INA") ... establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985). When aliens arrive in the United States, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," unless they indicate an intention to apply for asylum. 8 U.S.C. § 1225(b)(1)(A)(i). In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution. § 1225(b)(1)(B)(ii). If the alien makes that showing, he "shall be detained for further consideration of the application for asylum." *Id.* (emphasis added),

120.　Aliens not subject to Section 1225(b)(1) are governed by Section 1225(b)(2), which requires that, unless an alien is "clearly and beyond a doubt entitled to be admitted," the alien "*shall* be detained" pending further immigration proceedings. § 1225(b)(2); *see Jennings*, 138 S. Ct. at 837. Because Congress has mandated detention under both

---

[40] https://www.washingtonpost.com/national/border-arrests-record-levels-2021/2021/10/19/289dce64-3115-11ec-a880-a9d8c009a0b1_story.html
[41] *Id.*

43

subsection (b)(1) and subsection (b)(2), arriving aliens—other than those who are clearly and beyond a doubt entitled to be admitted—are to be released only pursuant to the government's parole authority, which is described in 8 U.S.C. § 1182(d)(5)(A).

121. This parole authority may be used only "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Other than parole, there are "no other circumstances under which aliens detained under § 1225(b) may be released." *Jennings*, 138 S. Ct. at 844; *see also* 8 C.F.R. § 208.30(f)(2) (explaining that Section 1182(d)(5) is the only basis for releasing an alien to which Section 1225(b)(1) applies); 8 C.F.R. § 212.5 (describing some of DHS's parole practices).

122. Notably, the government's parole authority previously was much broader, and could then be used "for emergent reasons or for reasons deemed strictly in the public interest." Congress, however, subtantially narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

123. Mandatory detention aside, the government is also required to initiate removal proceedings against these aliens. The government does so by serving the alien with a charging document, which is the document that initiates proceedings in immigration court. For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[42]

---

[42] *See* https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal%20-%20English%20%2817%29.pdf, at 1–2 (discussing other similar charging documents).

124.    For aliens falling under Section 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed ... without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed ... without further hearing or review." *Id.* at § 1225(b)(1)(B)(iii)(I). And even for aliens who pass a credible fear screening, they still must be served with a charging document. USCIS admits this.[43] The same is true of aliens falling under Section 1225(b)(2). These aliens must be "detained for a proceeding under Section 1229a," 8 U.S.C. § 1225(b)(2)(A), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

**Defendants Have Created A Crisis At The Border**

125.    Defendants have dismantled much of the country's border enforcement infrastructure, for example, 1) by imposing a near-moratorium on alien removals through a memorandum issued on January 20, 2021, through interim guidance issued by DHS on February 18, 2021, and then through similar permanent guidance issued on September 30, 2021; 2) by abandoning the Migrant Protection Protocols (MPP) requiring that aliens from third countries requesting asylum at the border with Mexico must wait in Mexico while awaiting adjudication of their asylum application[44]; and 3) by abandoning construction of already-planned and funded border wall and fencing. Defendants' actions have led to an

---

[43] *See* https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28Approved%20as%20final%2011-7-11%29.pdf, at 2 (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf, at 5.

[44] Defendants' attempt to abandon MPP was enjoined by a district court, and both the Fifth Circuit and U.S. Supreme Court have denied the federal government's requests for a stay pending appeal. *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (Aug. 24, 2021); *State v. Biden*, No. 21-10806, 2021 WL 3674780, at *1 (5th Cir. Aug. 19, 2021).

enormous increase in attempted border crossings by eliminating disincentives to being caught.

126.    DHS's own statistics reveal the unprecedented surge of unlawful migration and the collapse of DHS's control of the border. July 2021 had the highest number of encounters in *decades*—"the highest monthly encounter number since Fiscal Year 2000."[45] DHS data show that the number of border encounters in July 2021 was more than five times the July 2020 and July 2018 numbers, and roughly 2.5 times July 2019.[46] DHS itself has admitted that it is "encountering record numbers of noncitizens ... at the border" that "have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity."[47]

127.    Reporting by the Washington Post on October 20 reveals internal DHS data showing that apprehensions at the southwest border "soared to the highest levels ever recorded."[48]

128.    Secretary of Homeland Security Alejandro Mayorkas acknowledged in August 2021 that the Department of Homeland Security has lost control of the border, lamenting that the current situation is "unsustainable," that it "cannot continue," that the system is getting close to "breaking," and that "we're going to lose."[49]

**Defendants' Violations Of The INA Relating To Parole**

---

[45] Declaration of David Shahoulian (DHS Assistant Secretary for Border and Immigration Policy) at 1-2, *Huisha-Huisha v. Gaynor*, No. 21-cv-100 (D.D.C. Aug. 2, 2021)

[46] https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

[47] *Supra*, n. 45.

[48] https://www.washingtonpost.com/national/border-arrests-record-levels-2021/2021/10/19/289dce64-3115-11ec-a880-a9d8c009a0b1_story.html

[49] Edmund DeMarche, Emma Colton, and Bill Melugin, "Mayorkas says border crisis 'unsustainable' and 'we're going to lose' in leaked audio," *Fox News* (Aug. 13, 2021), https://www.foxnews.com/politics/mayorkas-leaked-audio-border.

129.     Defendants are systematically violating the detention and removal requirements of Section 1225. Moreover, they are also ignoring the INA's limitations on the authority to parole aliens into the United States. For the entire month of December 2020—President Trump's last full month in office—the Border Patrol released into the interior only 17 aliens after arresting them crossing the Southwest border and serving them with a notice to appear.[50] By July 2021, that number had risen to over 60,000, and the total number of unlawful aliens that Border Patrol has released at the border since President Biden took office is over 225,000.[51]

130.     Releasing this many arriving aliens into the interior necessarily means that the government is violating Congress's commands in the INA. If immigration officials are simply releasing these aliens, they are violating the mandatory detention provisions in Section 1225. If they are, instead, paroling each of these individuals, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

131.     It is also unclear whether the numbers reported by CBP include the approximately "50,000 migrants who crossed the southern border illegally" and were released without even being served with a notice to appear.[52] For these unlawful aliens, and likely many more, the government has instead served them with a "notice to report," a document nowhere mentioned in statute or regulation, which apparently functions as

---

[50] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[51] The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

[52] https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html

"immigration enforcement by the honor system."[53] Predictably, although the notice to report asks these aliens to turn themselves into an ICE office within 60 days, approximately 80% fail to do so.[54]

132. Border Patrol documents that were leaked to the press in October 2021 show that Defendants have released "[a]t least 160,000 illegal immigrants ... into the U.S. [since March 2021], often with little to no supervision." The documents also show that Defendants have made "broad use of limited parole authorities to make more than 30,000 eligible for work permits since August [2021]" and that since August 6, 2021, "the administration has released an additional 40,000 illegal immigrants on their own recognizance."[55]

133. Beyond Defendants' failed honor-system policy, serving a notice to report has other significant consequences. Most importantly, once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed *in absentia*." *Texas v. Biden*, __ F. Supp. 3d __, 2021 WL 3603341, at *4 (N.D. Tex. 2021). After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who declines to report following issuance of a notice to report—again, because this document has no legal significance and is nowhere to be found in statute or regulation.

134. And, as further explained below, even aliens who are served with charging documents frequently do not appear for their removal proceedings. The Biden

---

[53] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system

[54] *Id.*

[55] Bill Melugin and Adam Shaw, "Leaked Border Patrol docs show mass release of illegal immigrants into US by Biden administration," *Fox News*, August 13, 2021 (https://www.foxnews.com/politics/leaked-border-patrol-docs-release-immigrants-us-biden-administration).

Administration is thus giving tens-of-thousands of aliens per month, in essence, license to disappear into the interior of the United States.

135. DHS's illegal use of its parole to promote open-border policies is consistent with multiple other violations of immigration mandates by the Biden Administration, as courts have repeatedly held. *See, e.g.*, *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 2096669, at *38 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 3683913, at *42 (S.D. Tex. 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).[56]

136. The Administration has even been found to have violated Section 1225(b)'s detention requirements, the same requirements Arizona claims the government is violating here. *See Texas v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) (denying a stay because "the Government has not come close to showing that it is likely to succeed in challenging" the conclusion that it violated 8 U.S.C. § 1225).[57]

137. In those cases, the Biden Administration insisted it lacked the resources to comply with its duties. *See, e.g.*, Mot. for Stay at 4, *Texas*, 2021 WL 3683913 (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

138. Meanwhile, the Biden Administration is going out of its way to make its bad-faith protests about limited resources closer to reality. For example, the Administration has

---

[56] A panel of the Fifth Circuit stayed that preliminary injunction in part, but declined to stay the injunction insofar as it required the federal government not to release aliens subject to those two statutes. *See Texas v. United States*, --- F.4th ---, 2021 WL 4188102, at *3 (5th Cir. 2021).

[57] The Supreme Court also denied the government a stay. *See Biden v. Texas*, --- S. Ct. ---, 2021 WL 3732667 (Aug. 24, 2021)

asked Congress to reduce the number of immigration detention beds available to it.[58] It has justified this request in part based on "recent decreases in interior enforcement activity."[59]

139.    Similarly, the Administration has eliminated programs designed to reduce the taxing of immigration resources and detention space. For example, on its first day in office, the Biden Administration suspended the Migrant Protection Protocols. *Biden*, 2021 WL 3603341 at *7. This DHS program "returned some aliens temporarily to Mexico during the pendency of their removal proceedings." Id. at *1. As CBP's statistics show, the Migrant Protection Protocols were effective at eliminating the illegal release of arriving aliens at the border because aliens remained in Mexico pending adjudication of their asylum claims rather than occupying DHS detention capacity.[60] *See also Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of the program, in which DHS found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border"). Unlike the Biden Administration's release policies, this program is expressly authorized by the immigration laws, which provide that "[i]n the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a [removal] proceeding." 8 U.SC. § 1225(b)(2)(C).

140.    And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. See, e.g., Exec. Order No. 14,010, Creating a Comprehensive Regional Framework to

---

[58] https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-4d7427ff67d586a77487b7efec58e74d; Congressional Research Service, *DHS Budget Request Analysis: FY2022*, at 13 (noting that DHS's FY 2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY 2021 (reducing that average to 30,000)).

[59] https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_en forcement.pdf, at 43

[60] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab); https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (same)

Address the Causes of Migration, 86 Fed. Reg. 8267, 8270 (Feb. 2, 2021) (revoking, among others, Executive Order 13767, which directed DHS to "terminat[e] ... the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

141. Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[61] The Biden Administration has, of course, not sought to do so.

**The Border Crisis Harms The State of Arizona**

142. States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id*. at 410. Arizona thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

143. As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration. Arizona is required to expend its scarce resources when DHS fails to carry out its statutory duty to detain or remove aliens as provided by law. This includes resources expended by Arizona's law enforcement community.

144. Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal

---

[61] *Immigration Detenting: Opportunities Exist to Improve Cost Estimates*, United States Government Accountability Office (April 2018), https://www.gao.gov/assets/gao-18-343.pdf.

Assistance Program ("SCAAP") requests, the great majority of which are not reimbursed by the federal government.

145. Defendants' actions encourage a greater influx of unauthorized aliens into Arizona, further increasing law enforcement costs in Arizona, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

146. Federal law also requires that emergency medical services be provided to unlawfully present aliens. 42 C.F.R. § 440.255(c). Arizona emergency medical providers deliver millions of dollars in medical services to unlawfully present aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves. While these costs are impactful in typical years, the COVID-19 pandemic makes the potential for harm to Arizona through additional emergency healthcare costs to unauthorized aliens exceptionally high. Defendants' failure to detain or remove aliens, and Defendants' unlawful use of parole to allow hundreds of thousands of aliens to enter the United States, necessarily increases the number of unlawfully present aliens in Arizona who are subject to receiving such medical care at the expense of Arizona's healthcare institutions.

147. Defendants' failures to remove or detain aliens, and Defendants' unlawful use of parole to allow hundreds of thousands of aliens to enter the United States, will increase Arizona's costs of providing emergency medical care to these individuals who would otherwise be removed or detained. Additionally, Defendants' actions encourage a greater influx of unauthorized aliens into Arizona, further increasing the population of unauthorized aliens for whom Arizona must bear the cost of emergency medical care.

# CLAIMS FOR RELIEF

## COUNT I

### BY ALL PLAINTIFFS EXCEPT JOHN DOE

**Violation of the Procurement Act**

**(Asserted Under 40 U.S.C. §§ 101 and 121,**

**5 U.S.C. §§ 702, 704, and 706, and as a non-statutory cause of action)**

148.    The allegations in the preceding paragraphs are reincorporated herein.

149.    There is no nexus between Defendant's vaccine mandates and the Procurement Act's purpose of providing an "economical and efficient system" of procurement, 40 U.S.C. § 101 and in fact will have a deleterious effect on economy and efficiency by causing large-scale resignations of unvaccinated employees of federal contractors.

150.    The purpose of the Procurement Act is *not* to impose a sweeping vaccination mandate on broad swaths of the American people or to use the federal procurement system as a proxy for implementing a nationwide public health mandate.

151.    Defendants' attempt to impose sweeping controls on one-fourth of the economy via procurement is a question of deep economic and political significance, and Congress did not intend, nor does the Procurement Act allow, the President to exercise such sweeping authority under the guise of "procurement" in the absence of clear and explicit congressional authorization. Such arrogation of power violates the Major Questions Doctrine. This is because had Congress intended to give the Executive or its agencies discretion to decide which kinds of vaccinations for what malaises should be mandatory to which categories of people, then Congress would have legislated to that effect. After all, Congress does not upend or even "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468

(2001). "It is especially unlikely that Congress would have delegated this decision to" the Executive (especially the SFWTF), which lacks "expertise in crafting" sensible rules "of this sort" in the absence of clear statutory guidance. *King*, 576 U.S. at 486 (citing *Gonzales v. Oregon*, 546 U.S. 243, 266–67 (2006)). Nowhere do the federal procurement statutes authorize the President to take over more than one-quarter of our national economy—and to do so flying solo, without congressional authorization. And in the absence of such authorization, the President certainly is not entitled, with the stroke of his own pen, to displace state law or preclude state authority in an area of State police powers such as public health.

152. Before the executive branch may regulate a major policy question of "great and economic and political significance"—such as mandating vaccination for every employee of every federal contractor in the country—Congress must "speak clearly" to assign the authority to implement such a policy. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citing *Util. Air Regul. Grp. v. E.P .A.*, 573 U.S. 302, 324 (2014)). When the federal government intrudes on a traditional state function, it must clearly articulate the scope of the intrusion and the rationale behind its unprecedented action, which it has not done here. Gregory v. Ashcroft, 501 U.S. 452, 463–64 (1991).

153. Furthermore, the Contractor Mandate unequivocally and severely will damage economy and efficiency because it will lead to a mass exodus of the employees of federal contractors.

154. The reach of the Contractor Mandate is too broad to be consistent with the Procurement Act. Even assuming that more vaccinated employees would promote efficiency "by reducing absenteeism and decreasing labor costs," as OMB said, 86 Fed. Reg. 53,692, and even assuming that the Contractor Mandate would not cause widespread resignations or dismissals of employees, the Contractor Mandate's overbreadth makes

plain that its real purpose is not to achieve economy and efficiency, since it applies to employees who work remotely and employees who have the most fleeting interactions with employees working on federal contracts. Such breadth is unnecessary to prevent the spread of COVID-19, and so completely unconnected with any possible rationale relating to economy and efficiency.

155. Additionally, the Contractor Mandate's application to subcontractors has no direct connection to federal procurement and thus lies outside the Procurement Act.

156. And because even vaccinated individuals can spread COVID-19, the contractor vaccine mandate, insofar as it seeks to promote economy and efficiency by limiting the spread of the virus is not appropriately tailored to achieve its goals.

157. Defendants' mandate on sub-contractors has no direct connection to federal procurement and thus does not lie reasonably within the contemplation of' the Procurement Act.

158. Defendants' vaccine mandates for contractors and subcontractors are therefore unlawful under the Procurement Act.

**COUNT II**

**BY ALL PLAINTIFFS EXCEPT JOHN DOE**

**Violation of Procurement Policy Act**

**(Asserted Under 41 U.S.C. § 1707(a),**

**5 U.S.C. §§ 702, 704, and 706, and as a non-statutory cause of action)**

159. The allegations in the preceding paragraphs are reincorporated herein.

160. The SFWTF contractor FAQ, the FAR Deviation Clause, and the Second OMB Notice each qualify as a procurement "policy" and a procurement "procedure" under 41 U.S.C. § 1707(a).

161. The SFWTF FAQ, the FAR Deviation Clause, and the Second OMB Notice relate to the expenditure of appropriated funds; have a significant effect beyond internal

operating procedures; and impose a significant cost and administrative impact on contractors and offerors.

162.    Defendants failed to publish for public comment in the Federal Register the SFWTF Contractor FAQ and FAR Deviation Clause as required by 41 U.S.C. § 1707. Nor did Defendants provide the required 60-day comment period before they became effective. *Id*.

163.    No authorized officer ever waived the requirements of the Procurement Policy Act as applied to the SFWTF Contractor FAQ or the FAR Deviation Clause, or to the vaccine mandates contained therein.

164.    Defendants failed to comply with the requirements of the Procurement Policy Act when issuing the SFWTF contractor FAQ and FAR Deviation Clause. The SFWTF FAQ and the FAR Deviation Clause are therefore unlawful. Inasmuch as the SFWTF FAQ and the FAR Deviation Clause are integral parts of the Contractor Mandate, the entire mandate is unlawful and "may not take effect." 41 U.S.C. § 1707. Furthermore, the Second OMB Notice did not properly waive the notice-and-comment requirements of 41 U.S.C. § 1707 and therefore also "may not take effect."

**COUNT III**

**BY ALL PLAINTIFFS**

**Violation of the EUA Statute**

**(Asserted Under 21 U.S.C. § 360bbb-3,**

**5 U.S.C. §§ 702, 704, and 706, and as a non-statutory cause of action)**

165.    The allegations in the preceding paragraphs are reincorporated herein.

166.    The vaccines available to federal contractors and employees to satisfy Defendants' vaccine mandates are only available under EUAs and are thus subject to the requirements of 21 U.S.C. § 360bbb-3.

167. Under 21 U.S.C. § 360bbb-3, recipients of vaccines available under EUAs must have the right "to accept or refuse administration of the" vaccines.

168. Defendants' vaccine mandates would strip from all federal employees, contractors, and subcontractors their right to refuse the EUA vaccines.

169. Defendants' vaccine mandates for federal employees and contractors are therefore unlawful under 21 U.S.C. § 360bbb-3.

## COUNT IV

## BY ALL PLAINTIFFS

## Violation of Right to Due Process, Bodily Integrity, and to Refuse Medical Treatment

## (Asserted Under Fifth Amendment to the U.S. Constitution, 5 U.S.C. § 702 and as a non-statutory cause of action)

170. The allegations in the preceding paragraphs are reincorporated herein.

171. Defendants' vaccine mandates violate the constitutional rights of federal employees and contractors to bodily integrity and to refuse medical treatment.

172. Defendants' vaccine mandates are therefore a violation of the Fifth Amendment of the Constitution and are therefore unlawful.

## COUNT V

## BY ALL PLAINTIFFS EXCEPT JOHN DOE

## Federalism

## (Asserted Under Tenth Amendment to the U.S. Constitution, 5 U.S.C. § 702, and as a non-statutory cause of action)

173. The allegations in the preceding paragraphs are reincorporated herein.

174. Nothing in the Constitution authorizes the federal agencies of the executive branch to impose the Contractor Mandate on states. The power to impose vaccine

requirements, to the extent that any such power exists, is a police power reserved to the States.

175.    Defendants, through the Contractor Mandate, have exercised power far beyond what was delegated to the federal government by Constitutional mandate or congressional action.

176.    Neither Article II of the U.S. Constitution nor any act of Congress authorizes the federal agencies of the executive branch to implement the Contractor Mandate, which to the extent any power exists to implement, traditionally falls under the police power left to the states under the Tenth Amendment.

177.    The Tenth Amendment explicitly preserves the "residuary and inviolable sovereignty," of the states. *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)).

178.    By interfering with the traditional balance of power between the states and the federal government and by acting pursuant to *ultra vires* federal action, Defendants violated this "inviolable sovereignty," and thus, the Tenth Amendment.

179.    Therefore, the Contractor Mandate was adopted pursuant to an unconstitutional exercise of authority by Defendants and must be invalidated.

**COUNT VI**

**BY ALL PLAINTIFFS EXCEPT JOHN DOE**

**Violation of Anti-Commandeering Doctrine**

**(Asserted Under the Tenth Amendment of the United States Constitution,**

**5 U.S.C. § 702, and as a non-statutory cause of action)**

180.    The allegations in the preceding paragraphs are reincorporated herein.

181.    The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

182.    That amendment, along with basic structural features of the Constitution, deprives Congress of "the power to issue direct orders to the governments of the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The Constitution thus does not tolerate the federal government dragooning State officers "into administering federal law." *Printz v. United States*, 521 U.S. 898, 928 (1997)

183.    The contractor vaccine mandate violates the anti-commandeering doctrine by requiring agencies and political subdivisions of the State to enforce the Contractor Mandate against its own employees—including, most egregiously, employees that have nothing to do with federal contracts or those who are working remotely—and against its subcontractors.

**COUNT VII**

**BY ALL PLAINTIFFS EXCEPT JOHN DOE**

**Non-Delegation and Violation of Separation of Powers**

**(Asserted Under Article I, Section 8 of the United States Constitution,**

**5 U.S.C. § 702, and as a non-statutory cause of action)**

184.    The allegations in the preceding paragraphs are reincorporated herein.

185.    To the extent Defendants argue that the Contractor Mandate is authorized, such authorization would violate the Constitution's nondelegation principles.

186.    The Contractor Mandate exceeds congressional authority.

187.    Pursuant to Article I, Section 1 of the United States Constitution, Congress is vested with all legislative powers, but Congress must act pursuant to the enumerated powers granted to it by Article I.

188.    The Constitution does not empower Congress to require anyone who deals with the federal government to get vaccinated. It is not a "proper" exercise of Congress's authority to mandate that every employee who touches a federal contract or comes in

contact with another employee who touches such a contract, has to be vaccinated because the action here falls outside the scope of an Article I enumerated power.

189. Defendants, through the Contractor Mandate, have exercised power that Congress does not possess under the Constitution and, therefore, cannot delegate to other branches of the federal government.

**COUNT VIII**

**BY ALL PLAINTIFFS EXCEPT JOHN DOE**

**Agency Action Not in Accordance with Law and in Excess of Authority, Arbitrary and Capricious Agency Action, and Notice-and-Comment Failure in Violation of the APA**

**(Contractor Mandate)**

**(Asserted Under the APA, 5 U.S.C. §§ 702, 704, and 706)**

190. The allegations in the preceding paragraphs are reincorporated herein.

191. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), Pursuant to 5 U.S.C. § 553, agencies must publish "a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2384 (2020); 5 U.S.C. § 553(b).

192. Pursuant to 48 C.F.R. 1.501, "significant revisions" to the FAR must be made through notice-and-comment procedures. DOD, NASA, and the General Services Administration must jointly conduct the notice-and-comment process. *Id*.

193. Instead of amending the FAR to implement this significant revision, the FAR Council issued a purported "class deviation" without engaging in the notice-and-comment process. *See*, 5 U.S.C. § 553.

194.    Proper "class deviations" must fit within one of the discrete definitions set forth in 48 C.F.R 1.401.

195.    Here, however, the FAR Deviation Clause fits none of the definitions.

196.    Instead, the FAR Deviation Clause is in the nature of a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

197.    The FAR Council violated the APA by failing to comply with the notice-and-comment requirements for rulemaking.

198.    The OMB Determination adopting the Task Force guidance is contrary to law for at least four reasons.

199.    First, the OMB Determination violates 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

200.    EO 14042 apparently seeks to circumvent § 1303 by delegating the President's Procurement Act power to the OMB Director.

201.    That attempt is unlawful because the President has no authority to issue regulations under § 1303—only the FAR Council may issue government-wide procurement regulations. *See*, *Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

202.    Second, and relatedly, the OMB rule is contrary to law because the Procurement Act does not grant the President the power to issue orders with the force or effect of law. Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out." 40 U.S.C. § 121(a).

203.  "[P]olicies and directives" describe the President's power to direct the exercise of procurement authority throughout the government. It does not authorize the President to issue regulations himself.

204.  Congress knows how to confer that power, as it authorized the GSA Administrator, in the same section of the statute, to "prescribe regulations." *Id*. § 121(c); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

205.  And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense. *See, e.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

206.  Third, even if the Procurement Act authorized the President to issue orders with the force or effect of law, it would not authorize approval of the SFWTF guidance. The President appears to assume that the Procurement Act's prefatory statement of purpose authorizes him to issue any order that he believes promotes "an economical and efficient" procurement system. 40 U.S.C. § 101.

207.  In doing so, the President mistakenly construes the prefatory purpose statement for a grant of authority. *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

208.  And even if the Procurement Act did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the OMB Determination does not adequately do so. Providing the federal government with an

"economical and efficient system for" procurement is not a broad enough delegation to impose a national-scale vaccine mandate that Congress has not separately authorized.

209. Further, the executive order is divorced from the practical needs of procurement. In order to maintain a steady and predictable flow of goods and services—and the advancement of science and technology through research and development—the federal procurement system requires a stable and reliable workforce to timely perform work required under tens of thousands of federal contracts and funding agreements. The Contractor Mandate disrupts the stability and reliability of the contractor workforce by forcing contractors to potentially fire unvaccinated and non-exempt covered employees, many of whom are highly skilled and essential to the work.

210. Because the OMB Determination violates § 1303(a), seeks to exercise a delegated power the President does not possess, and relies on a misreading of the Procurement Act, it is contrary to law.

211. Pursuant to 48 C.F.R. 1.402, "[u]nless precluded by law, executive order, or regulation, deviations from the FAR may be granted [] when necessary to meet the specific needs and requirements of each agency."

212. The Contractor Mandate and the OMB Determination were implemented with no express findings, no explanation, and no consideration of the distinct and diverse universe of federal agencies.

213. The Contractor Mandate and the OMB Determination impose universal and uniform requirements without regard to the particularized needs and circumstances of each federal agency and are therefore arbitrary and capricious in violation of the APA.

# COUNT IX

## BY PLAINTIFFS BRNOVICH AND STATE OF ARIZONA ONLY

### Agency Action Not in Accordance with Law and in Excess of Authority

### (Defendants' Parole Policies)

### (Asserted Under 5 U.S.C. §§ 702, 704, and 706)

214.    The allegations in the preceding paragraphs are reincorporated herein.

215.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority, or limitations, or short of statutory right." See 5 U.S.C. § 706(2)(A), (C).

216.    Defendants' policy—whether codified in writing or not[62]—of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2). And if Defendants claim to be exercising their parole authority, their policy is contrary to 8 U.S.C. § 1182 because that authority is neither being used "on a case-by-case basis" nor limited to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

217.    Nor does any regulation authorize Defendants' policy. 8 C.F.R. § 212.5—the principal parole regulation—says nothing about the mass release of arriving aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of Sections 1225(b) and 1182(d)(5)(A).

218.    Moreover, for the reasons described in ¶¶ 123-24, Defendants are required at a minimum to issue charging documents to arriving aliens released into the interior and initiate removal proceedings, which the Biden Administration has failed to do at least 50,000 times since taking office.

---

[62] An unwritten policy is subject to APA challenge just as a written policy is. *See Brotherhood of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities).

219.    Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT X

### BY PLAINTIFFS BRNOVICH AND STATE OF ARIZONA ONLY

### Arbitrary and Capricious Agency Action in Violation of the APA

### (Defendants' Parole Policies)

### (Asserted Under 5 U.S.C. §§ 702, 704, and 706)

220.    The allegations in the preceding paragraphs are reincorporated herein.

221.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

222.    Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

223.    Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

224.    Moreover, Defendants have neither accounted for Arizona's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Regents*, 140 S. Ct. at 1913.

225.    Finally, insofar as Defendants claim their policy is justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy

of reducing immigration resources and detention capacity. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

**COUNT XI**

**BY PLAINTIFFS BRNOVICH AND STATE OF ARIZONA ONLY**

**Failure to Comply with Notice-and-Comment Requirements in Violation of the**

**APA**

**(Defendants' Parole Policies)**

**(Asserted Under 5 U.S.C. §§ 702, 704, and 706)**

226.    The allegations in the preceding paragraphs are reincorporated herein.

227.    The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

228.    Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[63]

---

[63] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). But the reason the en banc court did not address the notice-and-comment argument is because the federal government conducted notice and comment in response to the panel opinion. *Id*. at 984.

**COUNT XII**

**BY PLAINTIFFS BRNOVICH AND STATE OF ARIZONA ONLY**

**Agency Action Unlawfully Withheld or Unreasonably Delayed in Violation of the APA**

**(Defendants' Parole Policies)**

**(Asserted Under 5 U.S.C. §§ 702, 704, and 706)**

229.   The allegations in the preceding paragraphs are reincorporated herein.

230.   At a minimum, Defendants' near-blanket refusal to comply with the mandatory-detention provisions in Section 1225 and the limits on their parole authority in Section 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

**COUNT XIII**

**BY PLAINTIFFS BRNOVICH AND STATE OF ARIZONA ONLY**

**Violation of the INA and the Constitution**

**(Defendants' Parole Policies)**

**(Asserted Under The INA, The Constitution,**

**5 U.S.C. § 702, and as a non-statutory cause of action)**

231.   The allegations in the preceding paragraphs are reincorporated herein.

232.   The APA aside, the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count VII. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment:

A. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, Defendants' COVID-19 vaccine mandates on federal contractors because they violate the Tenth Amendment of the Constitution, principles of federalism, and the anti-commandeering doctrine;

B. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, Defendants' COVID-19 vaccine mandates on federal employees and contractors because the mandates violate Due Process under the Fifth Amendment of the Constitution;

C. Declaring, pursuant to 28 U.S.C. § 2201, that the SFWTF contractor FAQ, FAR Deviation Clause, and Second OMB Notice are unlawful under 41 U.S.C. § 1707(a);

D. Declaring, pursuant to 28 U.S.C. § 2201 that the Contractor Mandate is unlawful under 40 U.S.C. §§ 101 and 121;

E. Declaring, pursuant to 28 U.S.C. § 2201, that Defendants' requirements that federal employees, contractors, and sub-contractors must accept administration of EUA vaccines is unlawful under 21 U.S.C. § 360bbb-3;

F. Declaring unlawful the Biden Administration's policy of releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States, and declaring that these policies were issued without observance of procedure required by law;

G. Enjoining Defendants from imposing COVID-19 vaccination requirements on federal contractors, sub-contractors, and employees;

H. Enjoining Defendants from issuing any COVID-19 contractor vaccine requirements, guidance, or contract clauses without first following the required notice-and-comment procedures of the Procurement Policy Act and the APA;

I. Enjoining Defendants from releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the

other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States;

J. Awarding Plaintiffs costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

K. Granting any and all other relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 19th of November, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By: */s/James K. Rogers*
 Joseph A. Kanefield (No. 15838)
 Brunn W. Roysden III (No. 28698)
 Drew C. Ensign (No. 25463)
 James K. Rogers (No. 27287)

*Attorneys for Plaintiffs Mark Brnovich and the State of Arizona*

**WILENCHIK & BARTNESS PC**

By: */s/ Jack Wilenchik (with permission)*
 Jack Wilenchik (No. 029353)

*Attorney for Plaintiff John Doe*

**NAPIER, BAILLIE, WILSON, BACON & TALLONE, P.C.**

By: */s/ Michael Napier (with permission)*
 Michael Napier (No. 002603)
 Eric R. Wilson (No. 030053)
 Cassidy L. Bacon (No. 031361)

*Attorneys for Plaintiff PLEA and United Phoenix Firefighters Association Local 493*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of November, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all Defendants, who have appeared, are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing. Other counsel will be served with this Motion when they are served pursuant to Rule 4 or otherwise accept service.

 /s/ James K. Rogers
*Attorney for Plaintiffs Mark Brnovich, in his official capacity as Attorney General of Arizona; and the State of Arizona*
